Barbara **PRINCE**, Administratrix c.t.a. of the Estate of Robert J. Reilley, Deceased

v.

The **TRUSTEES OF the UNIVERSITY OF PENNSYLVANIA**, a corporation

and

**American Cyanamid Company**

and

**Tenneco Chemicals, Inc.**

Civ. A. No. 38248.

United States District Court
E. D. Pennsylvania.

Feb. 20, 1968.

Amended Order Feb. 2~, 1968.

Amendment To Order Feb. 29, 1968.

Milton M. Borowsky, of Freedman, Borowsky & Lorry, Philadelphia, Pa., for plaintiff.

Henry W. Sawyer, II, of Drinker Biddle & Reath, Philadelphia, Pa., for University of Pa.

834

F. Hastings Griffin, Jr., of Dechert, Price & Rhoads, Philadelphia, Pa., for American Cyanamid Co. and Tenneco Chemicals, Inc.

## OPINION AND ORDER

BODY, District Judge.

Two separate motions involving different defendants are presently before the Court. First, the defendant Trustees of the University of Pennsylvania [hereinafter "University"] have moved to dismiss this wrongful death and survival action on the sole ground that plaintiff's claim for damages against them cannot, as a legal certainty, reach the jurisdictional amount required in all diversity actions. 28 U.S.C. Section 1332(a)[1] Second, the two defendant drug companies, American Cyanamid Company (hereinafter "Cyanamid") and Tenneco Chemicals, Inc. (hereinafter "Tenneco"), filed a motion for summary judgment predicated on the theory that the negligence and breach of warranty actions brought against them are barred by certain allegedly applicable statutes of limitation.

The relevant facts alleged in plaintiff's complaint are as follows: On July 6, 1944 plaintiff's decedent, Robert J. Reilley, a New Jersey domiciliary, was admitted to the University of Pennsylvania Hospital on the advice of a Pennsylvania physician for a full week of observation and tests for a condition unrelated to the present litigation. Sometime during that week Mr. Reilley received an injection of a drug known as "Thorotrast"[2] into his neck. He was re-admitted to that hospital in February of 1949 for treatment of a lump which had developed on his neck in the area of the Thorotrast injection. Early in September 1963 the decedent again returned to the University of Pennsylvania Hospital, this time in serious condition.

Mr. Reilley succumbed to a malignant disease on September 26, 1963 in the Salem County Memorial Hospital in Salem, New Jersey, allegedly as a result of the 1944 injection of Thorotrast. The decedent's administratrix contends that neither she nor the decedent had any knowledge of the dangerous effect of Thorotrast before decedent's final hospitalization in September of 1963.

On June 8, 1965 the administratrix c. t. a. of decedent's estate, a Virginia resident, instituted this wrongful death and survival action claiming substantial damages for negligence and breach of warranty.

The liability of the University depends upon the alleged negligence of persons purported to be its agents and employees in permitting the drug to be administered to Mr. Reilley; their negligent administration of the drug to him; and their failure to follow certain post-operative procedures. The complaint also attributes to the University a breach of warranty in allegedly failing to provide Mr. Reilley with care and treatment in accordance with accepted medical and surgical standards.

The two defendant drug companies, Cyanamid and Tenneco, are charged with a breach of express and implied warranties that Thorotrast was a safe, fit and proper product for injection in the human anatomy as an aid to diagnostic studies. In addition, the complaint alleges the negligence of the drug companies primarily because they manufactured and sold the drug without warning of its presumably known dangerous properties.

Jurisdiction of the Court is based exclusively on diversity of citizenship. No federal question is presented.

1. Section 1332(a) of 28 U.S.C. provides: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interests and costs * * *."

2. The pharmaceutical designation of Thorotrast is "Collodial Thorium Dioxide". The drug was generally employed by physicians as an aid to diagnostic study.

## I.

### UNIVERSITY'S MOTION TO DISMISS

The only question presented by the University's motion to dismiss, and one involving an important choice of law problem, is whether the "grouping of contacts" test adopted by the Supreme Court of Pennsylvania in Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964), demands application of the substantive law of Pennsylvania or of New Jersey law to the facts of this case.

If New Jersey law applies, as the defendant University contends, plaintiff would be limited by statute [3] to a maximum recovery of $10,000 from the University, a charitable corporation. Thus plaintiff could not, as a legal certainty recover in excess of the federal jurisdictional amount. On the other hand, if Pennsylvania law applies, plaintiff is not bound by any damage ceiling [4] and the University's motion to dismiss would necessarily be denied.

Since jurisdiction is based on diversity of citizenship this Court must apply the law of Pennsylvania, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including its conflict of law rules. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Hartwell v. Piper Aircraft Corp., 186 F.2d 29 (3rd Cir. 1951). Both the plaintiff and the defendant University agree that the case of Griffith v. United Air Lines, supra, which rejected the old "lex loci delecti" rule in favor of the more enlightened "center of gravity" or "grouping of contacts" theory, is the law governing our disposition of the present motion to dismiss.

Thus it is our duty to ascertain whether the courts of Pennsylvania, if faced with these identical facts, would apply the substantive law of Pennsylvania or that of New Jersey to the issue before us. Gerr v. Emrick, 283 F.2d 293 (3rd Cir. 1960).

In *Griffith*, the decedent, a Pennsylvania domiciliary, purchased a ticket from United Air Lines, Inc. in Philadelphia for a round trip flight to and from Phoenix, Arizona. The plane crashed during a scheduled landing at Denver, Colorado, the crash causing the immediate death of decedent. Under Colorado law recovery of damages would have been minimal. In holding that decedent's executor could bring an assumpsit action in Pennsylvania, and that Pennsylvania law would apply, the court specifically overruled the line of cases which developed the lex loci delecti doctrine. However, after discussing various theories of liability based on "significant relationships" between local laws and the parties, the court analyzed the fact situation in

---

3. N.J.Stat.Ann. tit. 2A:53A–7 provides generally that all nonprofit corporation, societies or associations organized exclusively for religious, charitable, educational or hospital purposes are immune from liability "to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association * * *." N.J.S.A. 2A:53A–7. This broad grant of immunity is qualified in the case of hospitals by the language contained in the second section of the statute:

"Notwithstanding the provisions of the foregoing paragraph, any nonprofit corporation, society or association organized exclusively for hospital purposes shall be liable to respond in damages to such beneficiary who shall suffer damage from the negligence of such corporation, society or association or of its agents or servants to an amount not exceeding $10,000.00, together with interest and costs of suit, as the result of any 1 accident and to the extent to which such damage, together with interest and costs of suit, shall exceed the sum of $10,000.00 such nonprofit corporation, society or association organized exclusively for hospital purposes shall not be liable therefor." N.J.S.A. 2A:53A–8

4. In the now landmark case of Flagiello v. Pennsylvania Hospital, 417 Pa. 486, 208 A.2d 193 (1965), the Supreme Court of Pennsylvania abolished the rule of charitable immunity as it applies to hospitals.

*Griffith* and, as the basis for its decision, stated at 416 Pa. 1, 24, 203 A.2d 796, 807:

> "Pennsylvania's interest in the amount of recovery, on the other hand, is great. The relationship between decedent and United was entered into in Pennsylvania. Our Commonwealth, the domicile of decedent and his family, is vitally concerned with the administration of decedent's estate and the well-being of the surviving dependents to the extent of granting *full* recovery, including expected earnings." [Emphasis supplied]

As in *Griffith*, supra, the relationship between decedent and defendant hospital in the instant case was entered into in Pennsylvania. It is true that, unlike *Griffith*, the domicile of decedent and his family in this case is New Jersey. Therefore, one might argue that New Jersey enjoys the paramount interest here. New Jersey clearly maintains an important interest in the administration of the decedent's affairs. However, the interest of a full recovery, an interest which the court in *Griffith* carefully pointed out, would be best served by application of Pennsylvania law under which decedent's estate would not be limited in its recovery.

■■ The primary importance of the *Griffith* decision is the Court's insistence that in considering choice of law problems, it is necessary to analyze the policies and interests underlying the particular issue before the Court.

Applying the "interest analysis" approach of *Griffith*, we have concluded that Pennsylvania, not New Jersey, has the most significant relationship with this litigation. The following Pennsylvania "contacts" are important:

(1) The relationship between plaintiff's decedent and the defendant Hospital was entered into and centered in Pennsylvania when Mr. Reilley entered the University of Pennsylvania Hospital for diagnostic study;

(2) The alleged negligent acts, as well as the alleged breach of warranty occurred in Pennsylvania where the drug Thorotrast was administered to plaintiff's decedent;

(3) Pennsylvania is the place of incorporation of the defendant University and the state in which the University conducts its principal corporate activities; therefore, the University certainly could have anticipated law suits brought under Pennsylvania law and could not justifiably have relied on defenses available under New Jersey law, including the $10,000 limitation on damages which defendant now relies upon.

It is true that the symptoms of cancer which allegedly caused Mr. Reilley's death did not emerge, and were not identified until 1963 when he entered a New Jersey hospital. We conclude, however, that this fact, combined with the fact that the decedent resided in New Jersey, died there, and his estate was administered there, bears little relationship to the issues before the Court under any interest analysis approach.

The Court in *Griffith* emphasized that a "contact counting" or a "quantitative" contacts approach to conflicts issues was to be avoided. In the present case we are fully convinced that, qualitatively speaking, Pennsylvania has the most significant contacts with this litigation.

Even if we were to hold that New Jersey substantive law applies, we would not apply New Jersey limitation on damages. The Court in *Griffith* examined the policies and interests which Colorado had in the case before it and commented that an examination of the policies which apparently underlie the Colorado statute indicated that state's lack of interest in the amount of recovery in a Pennsylvania court. Inter alia, the court surmised that the limitation might have been intended to protect Colorado defendants from large verdicts against them. *Griffith v. United Air Lines*, 416 Pa. at 24, 203 A.2d at 796. In the instant case, it cannot seri-

ously be argued that the New Jersey statute was meant to limit recovery to one of its own domiciliaries from an out of state hospital having no real connection with New Jersey.

The New Jersey statute in question was obviously intended to protect New .Jersey charities from verdicts in excess of $10,000. Although it is true that the statute speaks in terms of *any* charitable corporation, it is clear that New Jersey was only empowered to legislate with respect to *New Jersey* charities.

In summary we find that the application of the *Griffith* method to the facts of the instant case makes it clear that the concern of Pennsylvania, as opposed to the interests of New Jersey, is unquestionably the greater. Thus, the defendant University's motion to dismiss must be denied since the plaintiff could conceivably recover in excess of $10,000 exclusive of interest and costs.

## II.

### DEFENDANT DRUG COMPANIES' MOTION FOR SUMMARY JUDGMENT

In their joint motion for summary judgment, the defendants Cyanamid and Tenneco contend that the plaintiff's wrongful death and survival actions are barred by the New Jersey statutes of limitations governing negligence and breach of warranty actions. The defendant's motion raises initially the question whether Pennsylvania or New Jersey limitations statutes govern the plaintiff's causes of action.

Since jurisdiction is based upon diversity of citizenship, this Court must apply Pennsylvania choice of law rules to determine whether to apply the Pennsylvania (forum) statute of limitations or the applicable New Jersey statute. Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Generally, Pennsylvania courts apply the forum state limitations statute. Freeman v. Lawton, 353 Pa. 613, 46 A.2d 205 (1946); Rosenzweig v. Heller, 302 Pa. 279, 153 A. 346 (1931).

However, the Pennsylvania courts, and therefore this Court, do recognize a specific exception whenever the Pennsylvania so-called "borrowing" statute is applicable to the cause of action at issue. See Mack Trucks, Inc. v. Bendix-Westinghouse Automotive Air Brake Co., 372 F.2d 18 (3rd. Cir. 1966). The "borrowing" statute provides that:

"When a cause of action has been *fully barred* by the laws of the state * * *in which it arose*, such bar should be a complete defense to an action thereon brought in any of the courts of the commonwealth." [Emphasis added] 12 P.S. § 39.

The statute requires an answer to two questions: [1] where did the causes of action arise? and [2] are the causes of action totally barred by the laws of the state in which it arose? In the case sub judice, the plaintiff's decedent, a New Jersey resident, received the allegedly negligent Thorotrast injection in Pennsylvania in 1944. He claims that he did not discover the injury caused by the injection until his New Jersey hospitalization in 1963. He died shortly after the discovery. The specific questions to be answered, then, are [1] whether the plaintiff's causes of action arose in New Jersey or in Pennsylvania; and [2] if arising in New Jersey, whether those causes of action are totally barred by New Jersey law.

In the *Mack Trucks* case, supra, the Third Circuit, over a strong and vigorous dissent by Judge Freedman, outlined the apparently appropriate analytical approach to the questions raised by the borrowing statute at issue. See 372 F.2d 18–21. It is necessary to discuss that case and its logical technique in some detail in order to apply that technique properly to the analogous causes of action now before us.

In *Mack*, the plaintiff trucking company brought an indemnity action in a Pennsylvania federal court against Bendix-Westinghouse, from whom Mack had purchased a defective brake pedal assembly. Mack had sold the defective

brake pedal assembly to a Florida resident for use in a truck. The truck was subsequently involved in an accident, and Mack was successfully sued in a Florida court. Formal satisfaction of the judgment was entered in the Florida court record on June 30, 1960. Mack filed its diversity indemnity action in Pennsylvania on October 10, 1963, over three years after the entry of the judgment satisfaction. Defendant Bendix and third - party defendant - manufacturer raised the Florida three-year statute of limitations on indemnity actions as an affirmative defense. The federal district court found that the indemnity cause of action arose in Florida and that under the Pennsylvania borrowing statute, the Florida statute of limitations was applicable and did bar the plaintiff's action. The sole question presented to the Third Circuit on appeal was whether, in the terms of the borrowing statute, the indemnity cause of action arose in Florida.

The majority opinion by Judge (now Chief Judge) Hastie approached the issue by first asking *when* the statute of limitations began to run. The court concluded that:

> "In this context, the familiar rule is that the statute begins to run when the cause of action arises, as determined by the occurrence of the final significant event necessary to make the claim suable. Foley v. Pittsburgh-Des Moines Co., 1949, 363 Pa. 1, 68 A.2d 517; Bell v. Brady, 1943, 346 Pa. 666, 31 A.2d 547."

372 F.2d 18, 20 (1966). It is clear that in arriving at this definitional standard for *when* the cause of action arose, the court relied on Pennsylvania decisional law. Judge Hastie then concluded that

the satisfaction of the judgment in Florida on June 30, 1960 was the "final significant event" which made the claim suable and thereby gave rise to the indemnity cause of action.

The court then noted that the Pennsylvania borrowing statute refers to *where* rather than to *when* the cause of action arises, but explained that:

> "We think the concept of when a cause arises and the concept of where a cause arises, both used to aid in the application of statutes of limitations, are *in pari materia*. In other words, the cause arises where as well as when the final significant event that is essential to a suable claim occurs. Bank of Nova Scotia v. San Miguel, 1st Cir. 1952, 196 F.2d 950; Orschel v. Rothschild, 1925, 238 Ill.App. 353; Runkle v. Pullin, 1912, 49 Ind.App. 619, 97 N.E. 956."

372 F.2d 18, 20 (1966). Since the court had already found that the cause of action arose *when* the judgment was satisfied in Florida, it necessarily concluded that the action arose *in* Florida.[5]

At this point, the court had found that the cause of action arose in Florida and that therefore the Pennsylvania borrowing statute would apply. Thus it became necessary to determine the effect of the relevant Florida statute of limitations on the plaintiff's indemnity action. The extent of the court's inquiry was to find the appropriate Florida statute, then to use that statutory period as a "simple chronological measure" 372 F.2d 18, 25 (dissenting opinion) of the vitality of the plaintiff's action. Having determined the appropriate statute, the court measured its three-year period from the date, June 30, 1960, *determined under*

5. It should be noted that dissenting Judge Freedman, relying on the Pennsylvania Supreme Court's decision in Griffith v. United Air Lines, 416 Pa. 1, 203, A.2d 796 (1964), strongly disputed the logic and the policy of the majority's conclusion "that the place where the cause of action arose should be fixed where the event occurs which starts the running of the time for the statute of limitations."

372 F.2d 18, 22. The majority found that the *Griffith* decision, which it characterized as a "common law conflict of laws rule for the choice of law to be applied in deciding the merits of certain issues", would not affect the meaning of the phrase "where the cause of action arose" in the Pennsylvania borrowing statute. 372 F.2d 18, 21.

*Pennsylvania law,* when the cause of action arose. The plaintiff's cause of action, filed in October 1963, was found barred by the Florida statute of limitations.

Application of the *Mack* majority technique to the causes of action here presented illustrates many of the problems of logic and policy forewarned in Judge Freedman's dissent. We shall treat the plaintiff's wrongful death and survival actions separately.

**A. *Wrongful Death Action:***

Pennsylvania requires that a wrongful death action be filed within one year after the death. 12 P.S. § 1603. New Jersey allows a two-year limitations period for a wrongful death action. 2A N.J. Stats.Ann. § 31–3 (1952). Plaintiff's decedent died on September 26, 1963. The wrongful death action was filed on June 8, 1965, beyond the Pennsylvania period, and within the New Jersey period.

 The Pennsylvania borrowing statute does not operate to a plaintiff's benefit; it is intended to protect defendants by making a shorter period of limitations available. Thus the Pennsylvania Supreme Court has held that "if the law of the forum provides a shorter period [than the law of the state where the cause of action arose] the action must be brought within the period prescribed." Foley v. Pittsburgh-Des Moines Co., 363 Pa. 1, 10, 68 A.2d 517, 522 (1949). See Hartwell v. Piper Aircraft Corp., 92 F. Supp. 271 (M.D.Pa.1950). Here, Pennsylvania provides a one-year limitations period which, under the facts of this

case, has already run. New Jersey's two-year statute arguably has not run.[6] Therefore, under Pennsylvania law, the shorter period governs and bars the wrongful death action; and the borrowing statute is inapplicable.

**B. *Survival Actions:***

**[i] Breach of Warranty**

In discussing the plaintiff's warranty theory of relief, we shall assume that the plaintiff seeks to recover for personal injury to the plaintiff's decedent solely on the basis of the defendant's alleged breach of contract. Any theory of relief grounded on allegedly negligent, tortious conduct will be discussed in subsection ii, infra.

 The immediate question is whether the Pennsylvania borrowing statute applies to the plaintiff's warranty cause of action. According to the *Mack* analysis, Pennsylvania state law determines when the cause of action arose, and the location of that event determines where the action arose. In Pennsylvania, a personal injury claim predicated solely upon a breach of warranty ordinarily accrues when and where the sale and delivery of the allegedly defective product occurs. Berg v. Remington Arms Co., 207 F.Supp. 65 (E.D.Pa.1962). It is clear that in this case, the "sale and delivery" (or injection) of the allegedly harmful Thorotrast occurred in July 1944 in Pennsylvania. Therefore, the warranty cause of action arose in Pennsylvania rather than in New Jersey, and the borrowing act is not applicable.[7]

6. New Jersey requires that the personal injury action which accrued to the decedent before his death must remain alive at the time of his death in order to vest in his beneficiaries as a wrongful death action. Kotkin v. Caprio, 65 N.J.Super. 453, 168 A.2d 69 (1961). Arguably plaintiff's decedent's personal injury action was barred by the New Jersey statute of limitations at the time of his death. See Rothman v. Silber, 90 N.J.Super. 22, 216 A.2d 18 (1966).

7. Because we have concluded that the borrowing act is not applicable, we do not rule on the defendants' contentions that

the warranty cause of action would also be barred under the New Jersey statute of limitations. We do note, however, that New Jersey actions for personal injury, even when based on a contractual theory of warranty breach, are governed solely by the state personal injury limitations statute. 2A N.J.Stats.Ann. § 31–3 (1952). Tackling v. Chrysler Corp., 77 N.J.Super. 12, 185 A.2d 238. That statute provides that the claim must be filed within two years after the cause of action accrues. However, in some exceptional situations the New Jersey courts postpone the running of the stat-

Finally, it is clear that any warranty cause of action accruing in Pennsylvania in 1944 was barred by the Pennsylvania warranty statute of limitations in 1950 and therefore is not cognizable in this case, in this Court. See Berg v. Remington Arms Co., supra.

### [ii] Negligence

The primary difficulty in applying the *Mack* decision to this case lies in determining whether the Pennsylvania borrowing statute governs the plaintiff's negligence theory of relief. The difficulty is created by the fact that Pennsylvania[8] and New Jersey[9] both provide a two-year period of limitations for personal injury actions, but differ on when that period of limitations begins to run in a malpractice-negligence action. The *Mack* decision, as shall be seen in the following application of its analytical technique to the problem presented, does not explicitly provide a theory for reconciling the two states' differing approaches.

 As has been observed earlier, the borrowing statute applies only upon satisfaction of two contingencies: (1) the cause of action must arise in another state; and (2) the cause of action must be totally barred by the laws of that state. Under the *Mack* analysis, satisfaction of the first contingency is determined by finding when the cause of action arose, and the determination is to be governed by Pennsylvania law. 372 F.2d 18, 20.

The Pennsylvania Supreme Court, has held that the statute of limitations in a personal injury malpractice case does not begin to run until the plaintiff or injured party either is aware or reasonably should be aware of the harm he has suf-

fered. In Ayers v. Morgan, 397 Pa. 282, 154 A.2d 788 (1959), the rule was applied to a sponge left in the complainant's abdomen during an ulcer operation. The source of pain which the complainant suffered was not discovered for nine years. In Schaffer v. Larzelere, 410 Pa. 402, 189 A.2d 267 (1963), this "discovery" rule was extended to a wrongful death action resting on allegedly negligent diagnostic treatment.

 In effect, the Pennsylvania "discovery" rule delays the accrual of the cause of action from the time of the defendant's negligent conduct to a time when the injury caused by that conduct becomes known or knowable. It is, obviously, a rule intended to benefit the plaintiff. The fairness of the rule has been praised:

"Avoidance of the injustice which might result where the injury * * * is 'inherently unknowable' at the time of the defendant's conduct would seem of greater moment than the desirability of repose and administrative expediency * * * [t]he burden on the courts probably would not be unduly increased, for the number of 'inherently unknowable' injuries would necessarily be small." Developments in the Law: Statutes of Limitations, 63 Harv.L.Rev. 1177, 1204–5 (1950).

The rule has been approved by other courts. See, e. g., Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (silicosis); Johnson v. Caldwell, 371 Mich. 368, 123 N.W.2d 785, 791 (1963) ("The trend * * * has been toward * * * the 'discovery rule' "); Agnew v. Larson, 82 Cal.App.2d 176, 185 P.2d 851 (1947).

 The plaintiff claims that neither she nor her decedent had any knowl-

---

ute until the wronged person becomes aware that the wrong has occurred and has caused him harm. Fernandi v. Strully, 35 N.J. 434, 173 A.2d 277 (1961). Compare Rothman v. Silber, 90 N.J.Super. 22, 216 A.2d 18 (1966). Thus it is at least arguable that if the New Jersey statute of limitations were found to apply to the plaintiff's warranty cause

of action, then the two-year period did not begin to run until September 1963, when the plaintiff's decedent allegedly became aware of the harm he had suffered.

8. 12 P.S. § 34.

9. 2A N.J.Stats.Ann. § 14–2 (1952).

edge of the dangerous effects of Thorotrast until the September 1963 date of the decedent's admission to Salem County Memorial Hospital in New Jersey. In deciding upon defendants' motion for summary judgment, we assume that allegation to be true. Applying Pennsylvania law, we conclude that the plaintiff's personal injury cause of action did not arise until the alleged time of discovery in 1963.

 The *Mack* opinion then instructs us that "the concept of when a cause arises and * * * where a cause arises * * * are *in pari materia.*" 372 F.2d 18, 20. Since the plaintiff's 1963 discovery of Thorotrast's alleged danger was made in New Jersey, we are apparently constrained by *Mack* to conclude that the cause of action arose in New Jersey; and that therefore the first contingency of the Pennsylvania borrowing statute has been satisfied.[10]

The defendants contend that if the plaintiff's cause of action arose in New Jersey, it is totally barred by the New Jersey statute of limitations,[11] and thus is also barred in Pennsylvania and in this diversity action by the borrowing act. The defendants' contention is based primarily on the premise that New Jersey does not apply the "discovery" rule to an injection of Thorotrast; that under New Jersey law the plaintiff's cause of action arose when the Thorotrast was injected in Pennsylvania in 1944; and that therefore the action is totally barred by the New Jersey personal injury statute of

limitations. We do not believe that either the *Mack* analysis or New Jersey law necessarily leads to the defendants' conclusions.

It is the second contingency of the Pennsylvania borrowing statute that is now at issue: is the plaintiff's cause of action totally barred by the laws of New Jersey? We believe it is not.

 The defendants' argument requires a piece of gymnastic analysis which we do not believe appropriate either under the *Mack* analysis or under the borrowing statute. We have already concluded that the plaintiff's cause of action arose in New Jersey in September 1963. If we use this point in time and place in space to measure the applicable limitations period, then neither the New Jersey nor the Pennsylvania two-year statutes of limitations had run when this action was filed and service accomplished by July 1965. Since the action would therefore not be barred under New Jersey law, the borrowing statute would *not* apply; and, as we have already seen, the action would not be barred under Pennsylvania law.

The defendants, however, apparently maintain that a two-step analysis is required: first, to determine applicability of the borrowing act, we must apply Pennsylvania law [12] to determine *when* and *where* the cause of action arose; second, having determined under Pennsylvania law that the action arose in 1963 in New Jersey, we should find the

---

10. It is certainly very arguable that the apparent purpose of the Pennsylvania "discovery" rule as expressed in Ayers v. Morgan, supra, casts doubt on the propriety of the *Mack* equation of the time with the place of the action's accrual. The *Ayers* court, by postponing the time when the statute of limitations would begin to run, intended to benefit the plaintiff. By equating time with place for purposes of construing the borrowing act, the *Mack* analysis exposes the plaintiff to a possibly more restrictive limitations statute in a foreign jurisdiction, and thus converts the pro-plaintiff "discovery" rule into a potentially pro-defendant limitations statute.

This would appear to pervert the policy choice in *Ayers*, and thus to lend support to Judge Freedman's dissenting argument in *Mack* that the place and time of the action's accrual should not be conclusively equated. 372 F.2d 18, 22.

11. 2A N.J.Stats.Ann. § 14–2 (1952).

12. It should be noted that if the court should look to New Jersey law at *this* juncture, and if the defendants contend correctly that New Jersey law regards the cause of action to have arisen in Pennsylvania at the time of the injection, then the borrowing statute would not apply at all.

effect of the New Jersey limitations statute by turning to New Jersey law to determine *anew* when and where the cause of action arose, and should totally disregard the answer to that question earlier provided by Pennsylvania law.

The *Mack* opinion does not utilize this proposed two-step analysis. In *Mack,* the majority simply measured the Florida statute of limitations from the date the action arose, *a date determined by Pennsylvania law alone.* 372 F.2d 18, 21. As seen above, application of this technique to the problem here presented leads to the conclusion that the action is barred neither in New Jersey nor in Pennsylvania. We believe that logic and policy support the correctness of that conclusion,[13] and conclude that the borrowing statute is not applicable to the plaintiff's cause of action.

Finally, even if we should conclude that the defendants' two-step approach is correct, and that the date of the action's accrual must be redetermined under New Jersey law, we would nevertheless conclude that the plaintiff's cause of action was not barred by the New Jersey two-year limitations statute. We have concluded that the New Jersey Supreme Court would apply the "discovery" rule to the circumstances of this case,[14] and that therefore the plaintiff's negligence cause of action did not accrue until September 1963. Fernandi v. Strully, 35 N.J. 434, 173 A.2d 277 (1961).

In *Fernandi,* supra, the New Jersey Supreme Court adopted the "discovery" rule with respect to so-called "foreign objects." The plaintiff's cause of action rested on her allegation that the defendant doctor had negligently left a wing nut in her abdomen during an operation. More than three years had passed since the alleged negligent act. However, the plaintiff had brought her personal injury action within two years after x-rays had discovered the source of her continuing abdominal pain. The court held that the statute of limitations did not begin to run until her discovery of the cause of her pain.

Other states adopting the discovery rule with respect to foreign objects have extended the rule to allegedly negligent medication prescription and to negligent diagnostic treatment. See, e. g., Agnew v. Larson, 82 Cal.App.2d 176, 185 P.2d 851 (1947); Johnson v. Caldwell, 371 Mich. 368, 123 N.W.2d 785 (1963). Indeed, in *Agnew,* supra, where the defendant contended that the foreign object rule should not extend to include drugs or medicine, the court observed that:

> "We fail to find any basis of differentiation * * * in the respective situations. * * *

13. It is admittedly somewhat anomalous to determine the date when the action arose by Pennsylvania law, and then measure the action by a New Jersey time period. However, it is suggested that it would be even more anomalous to employ the *defendant's* suggested analysis. We have arrived at a consideration of New Jersey law solely because we found that the cause of action accrued on September 1963 when the plaintiff was in New Jersey. To allow that finding to be the predicate for a totally contradictory conclusion under New Jersey law that the action accrued in 1944 in Pennsylvania, and to thus bar the plaintiff's action, cannot have been the intent either of the legislatures or of the courts of Pennsylvania or of New Jersey. Nor can we believe that the *Mack* opinion intended such a mechanistic approach to the problems here presented.

14. Because of our conclusion that New Jersey would apply the discovery rule to this case, we find it unnecessary to determine the effect of New Jersey's *nonresident tolling* provision. However, it should be noted that 2A N.J.Stats.Ann. § 14–22 (1952) provides that the personal injury statute of limitations (N.J. S.A. 2A:14–2) does not run during such time as a defendant corporation is not effectively "present" within the state. It appears from the pleadings that only *one* of the defendants, Tenneco Chemicals, Inc., has been effectively present in New Jersey. Thus even if the plaintiff's cause of action arose in 1944 in Pennsylvania, it is certainly arguable that the limitations period for that action has never begun to run against at least two of the corporate defendants.

* * * [t]he nature or character of the foreign substance or matter introduced into the body of the patient by the physician is immaterial."

185 P.2d 851, at 853–854. See also Huysman v. Kirsch, 6 Cal.2d 302, 57 P.2d 908 (Sup.Ct.Cal.1926); Greninger v. Fischer, 81 Cal.App.2d 549, 184 P.2d 694 (Sup.Ct.Cal.1947).

In 1964, the Law Division of the New Jersey Superior Court extended the *Fernandi* discovery rule to injected medicines, observing that "a foreign substance" includes drugs and medicines which are introduced into the body and which are not organically connected or naturally related." Rothman v. Silber, 83 N.J.Super. 192, 199 A.2d 86, 92 (1964). However, the Appellate Division of the Superior Court overturned the Law Division's ruling, and held that the *Fernandi* discovery rule should not be extended to the facts of the *Rothman* case. Rothman v. Silber, 90 N.J.Super. 22, 216 A.2d 18 (1966). The New Jersey Supreme Court, which refused to review the *Rothman* appellate ruling, has expressed no opinion on the proper boundaries of the *Fernandi* rule's applicability.

In *Rothman*, the plaintiff claimed that the defendant doctor had negligently administered a saddle-block spinal anesthesia which she had received during the birth of her child. The anesthesia was administered in March 1960. She filed her action in August 1962, five months beyond the two-year limitations period. Although in constant pain almost from the time when the anesthesia wore off, the plaintiff claimed that she had not discovered the *cause* of her pain until November 18, 1960.

Assuming that Pennsylvania's borrowing act makes relevant New Jersey law applicable here, we, in our diversity jurisdiction, are bound by that law as a Pennsylvania court would be. We express no opinion on the correctness of the appellate court's *Rothman* decision on its particular facts; suffice to say that if

the case sub judice presented identical facts, we would be constrained to follow *Rothman*. However, we do not read *Rothman* as expressing a general exception excluding all negligently administered drugs or medicine, and/or negligent diagnosis from the *Fernandi* discovery rule. Indeed, we feel that such a general exception fashioned by the Superior Court would be inconsistent with the Supreme Court's decision in *Fernandi*; and further, we believe the facts in *Rothman* operatively distinguishable from those presented in the instant case.

If *Rothman* were read as a general exception to the *Fernandi* rule, we, in our designated diversity capacity as the Supreme Court of New Jersey, would find it inconsistent with *Fernandi* and inadequate in its attempts to distinguish relevantly between "foreign objects" (e. g., sponges, wing nuts, rings) and drugs and medicines.

The purpose of the "discovery rule" is clear: it is to prevent the plaintiff from being penalized unfairly for failing to redress an injury, the cause of which he could not reasonably have known. Recognition of the discovery proposition represents a conscious choice of policy by the New Jersey Supreme Court: a choice between the value of repose to the defendant and the value of an opportunity for relief to the reasonably unknowing plaintiff. Accepting the fact that New Jersey has chosen to value the latter over the former, we do not understand the relevancy to that value hierarchy of the *Rothman* decision's particular criteria distinguishing drugs and medicines from other "foreign objects."

For example, the *Rothman* court distinguished anesthesia from the wing nut in Fernandi in the following manner: [15]

(1). A wing nut is left in a person's abdomen inadvertently; neither the plaintiff nor the defendant intend for the event to happen; nor is either aware of its occurrence. Therefore the plaintiff is, theoretically, more justified in failing to discover the cause of his pain.

15. See Rothman v. Silber, 90 N.J.Super. 22, 216 A.2d 18, 22–23 (1966).

Anesthesia, however, is injected deliberately, intentionallly, with plaintiff's and defendant's knowledge. Thus the plaintiff has less excuse for failing to connect the injury with the cause.

The distinction may be relevant to determining *when* the plaintiff reasonably should have discovered the cause of his harm.[16] However, we do not understand its relevancy in determining *whether* the discovery rule should be applied. Whether the defendant's *act* is known or unknown, intentional or inadvertent, does not really reflect on the plaintiff's ability to relate the defendant's act to the injury eventually suffered. This is particularly true when the harm manifests itself years after the defendant's act. Unless the defendant's act is of a nature that it causes the injury and the defendant's causal relationship to be immediately known or knowable, we do not believe the deliberate or accidental quality of that act affects the applicability of the discovery rule.

(2). A wing nut, in contrast to anesthesia (and most other drugs), retains its identity; thus the defendant's ability to defend a stale claim is enhanced.

This distinction would appear to be entirely irrelevant unless the defendant denies that he injected the drug or medicine, a fact which is usually uncontested and evidenced by medical records or bills for payment. If he does *not* deny administering the drug, its incapacity for retaining an identifiable character is irrelevant to his ability to defend a stale claim. Furthermore, if such a distinction were adopted, the plaintiff's ability to take advantage of the "discovery" rule would be totally dependent upon the defendant's truthfulness in pleading; a simple denial of the injection, or of injecting a particular allegedly harmful drug, could force a prohibitive application of the statute of limitations. We cannot believe the *Fernandi* court intend-

ed the discovery rule to be so easily circumvented.

(3). The wing nut is probative of negligence and harm, whereas anesthesia requires the jury to base its decision largely on the plaintiff's credibility and expert testimony on the allegedly negligent administration or selection of the drug. The time lapse in a wing nut case does not encourage a false or spurious claim. The time lapse in a drug case does encourage such claims.

This is certainly the most practical and compelling distinction in the *Rothman* opinion. The discovery rule may create a greater temptation to try a false or spurious claim, in the hope that the passage of time will have reduced the defendant's ability to defend himself. However, in an equal number of cases, the plaintiff's ability to prove an already difficult case may be substantially impaired by the harm to his credibility created by his delay, by the absence of now available witnesses, etc. The advantages and disadvantages created by the lapse of time should roughly balance out. Any decision to make a discovery rule available must have been cognizant of the problems inherent in long-delayed law suits. Certainly it would not seem proper to determine the availability of the discovery rule by the court's evaluation of the merit or the clarity of the plaintiff's cause of action. The jury is capable of weighing credibility and expert testimony; it is not the court's function to deprive the plaintiff of the opportunity for jury consideration merely because the court finds his claim a difficult or even an unlikely one. Surely the New Jersey Supreme Court did not intend to make the discovery rule exception to the limitations statute available only to those plaintiffs with clear-cut cases.

Finally, even if we accepted the *Rothman* criteria as generally valid, we would find the plaintiff's cause of action in

16. The distinction may have been relevant in this respect to the *Rothman* case on its own facts. In this case, the defend-ants have not claimed that plaintiff or decedent should have known the cause of his harm before September 1963.

this case to be distinguishable. It is true that here, as in *Rothman,* the plaintiff "slept" on her rights for almost two years even *after* the discovery of the harm.[17] However, the *Rothman* plaintiff apparently was injured and in pain almost immediately after the defendant's allegedly negligent act; whereas the plaintiff's decedent here did not begin to suffer for several years, at a time when the causal relationship of the defendant's act would be far less evident. The substantial harm accrued to the *Rothman* plaintiff almost immediately; the plaintiff's decedent here apparently did not suffer substantial harm for nearly twenty years. Compare Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). Therefore, the plaintiff's delay in bringing the action is not only very understandable, but arguably was *necessary* if substantial harm was to be proven. See Developments in the Law: Statute of Limitations, 63 Harv.L.Rev. 1177, 1200–01 (1950).

As far as the identifiable nature of Thorotrast is concerned, none of the defendants deny that the named companies manufactured and sold the drug, nor do they deny that the plaintiff received an injection of the drug at the University of Pennsylvania Hospital. Their substantive defenses would appear to rest on absence of negligence and absence of proximate cause. Thus the drug's lack of a permanent insignia in the decedent's body would not appear relevant to the defendants' ability to defend this claim.

Finally, the decedent's death and long-term physical infirmities are well-documented; there can be little doubt that the decedent has suffered, and has been harmed. Thus the credibility of the plaintiff's case will be a relatively unimportant factor. Indeed, it would appear that the most crucial evidence in the case will be that of the expert medical witnesses with respect to the standard of care and to proximate cause. The ability of the jury to comprehend and evaluate this testimony is, in all likelihood, greater than the ability of a jury would have been nineteen years ago.

For all of the above reasons, the motion of the defendants Cyanamid and Tenneco for summary judgment in this action is hereby denied.[18]

### ORDER

And now, this twentieth day of February 1968, it is ordered that the motion of defendant Trustees of the University of Pennsylvania to dismiss plaintiff's wrongful death and survival action be and the same is denied.

It is further ordered that the motion filed by defendants, American Cyanamid Company and Tenneco Chemicals, Inc., for summary judgment is also hereby denied.

### AMENDED ORDER

And now, this twenty-eighth day of February, 1968, it appearing that our opinion in the above matter dated February 20, 1968 contained one incorrect finding of fact, and it further appearing that the order attached to the opinion failed in part to conform with the conclusions contained in that opinion, the opinion and order are hereby amended by the following:

(1) The statement at page 2 of the opinion that the plaintiff's decedent returned to the University of Pennsylvania Hospital in 1963 is incorrect and should be stricken. The decedent apparently did not return to the Pennsylvania hospital after 1949. The Court was aware of the correct facts when deciding the merits of the issues presented. This amendment to the opinion is not, in our opinion, relevant to the merits of the case, and has no effect on our decision.

---

17. It is at least questionable whether a plaintiff should be penalized for a delay which is perfectly lawful if the discovery rule actually applies.

18. The defendant drug companies' contentions that the plaintiff as administratrix c.t.a. is not properly qualified to bring this action are found to be without merit.

(2) The order entered in the case is amended as follows:

It is ordered that the motion of defendant Trustees of the University of Pennsylvania to dismiss plaintiff's wrongful death and survival action be and the same is denied.

It is further ordered that the motion filed by defendants American Cyanamid Company and Tenneco Chemicals, Inc. for summary judgment is granted with respect to the plaintiff's wrongful death and breach of warranty actions; but is denied with respect to the plaintiff's negligence cause of action.

## AMENDMENT TO ORDER

And now, this Twenty-Ninth day of February, 1968, the Order of February 20, 1968 is further amended to add the following:

This order involves a question of law which is controlling and as to which there is substantial ground for difference of opinion. An immediate appeal may materially advance the ultimate termination of the litigation.