Fred SEIDERMAN, an incompetent by his guardian, Richard SEIDERMAN, and Richard Seiderman, individually, Plaintiffs,

v.

AMERICAN INSTITUTE FOR MENTAL STUDIES, a New Jersey corporation, also known as American Institute-The Training School at Vineland, a New Jersey corporation; Elwyn Institutes, a Pennsylvania corporation; Louis Coslop, individually, and doing business as Coslop Home Improvements; Robert Krentel; Earl Wilkie; H. Wesley Baxter; Jackie Steiner; John Vitena; Edward M. Hartman; Debbie Snyder; Stephanie Blackwell; Anita Spatz; Laurence Foster; Sharon Omrod and Leon Price, Defendants.

Civ. No. 86–1631.

United States District Court, D. New Jersey.

July 14, 1987.

Baer & Arbeiter by Carol A. Stevens, Metuchen, N.J., for plaintiffs.

Yampell & Kaplan, P.A. by Elliott Yampell, Haddonfield, N.J., for defendants Elwyn and American Institute for Mental Studies.

## OPINION

GERRY, District Judge.

Plaintiff Richard Seiderman has brought this action individually and as the guardian of plaintiff Fred Seiderman, an incompetent, against defendants American Institute for Mental Studies (AIMS) and Elwyn Institute (Elwyn) to recover for injuries allegedly sustained on June 4, 1984, when Fred Seiderman fell from a second story window while residing at an institution managed and controlled by the defendants. According to the complaint, at all times relevant to the events complained of plaintiff Fred Seiderman was a mentally handicapped patient and resident of AIMS, which is located in Vineland, New Jersey. Elwyn managed the institution pursuant to a management agreement entered into between the defendants in January of 1981.

In the first count of their complaint, plaintiffs allege, *inter alia,* that the defendants negligently failed to train their counsellors and employees in the proper procedures for caring for the mentally handicapped, that they negligently failed properly to supervise the plaintiff, and that they negligently failed to provide a safe and secure environment for the plaintiff. In the third count [1] of the complaint, plaintiffs allege that the defendants' conduct was grossly negligent, wanton, and in willful disregard of the safety of the plaintiff, and therefore seek recovery of punitive damages.

Presently before this court are the defendants' motions for summary judgment. Defendants AIMS and Elwyn have moved for summary judgment on the ground that they are immune from liability under N.J. S.A. 2A:53A–7, which provides:

> No nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes shall ... be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society or association, where such person is a beneficiary, to whatever degree, of the works of such nonprofit corporation, society or association; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation, society, or association or of its agents or servants where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation, society or association; but nothing herein contained shall be deemed to exempt the said agent or servant individually from their liability for any such negligence.

Defendants contend that they are charitable institutions within the meaning of N.J. S.A. 2A:53A–7. In support of their motion, they have submitted the affidavit of John R. Donaphon, the Vice President of Finance for Elwyn and the Assistant Treasurer of AIMS. He states that AIMS and Elwyn are nonprofit corporations incorporated under the laws of New Jersey and Pennsylvania, respectively, and that they operate long-term care facilities for mentally and physically disabled children and adults. Defendants have also provided recent correspondence from the United States Internal Revenue Service confirming that both AIMS and Elwyn have tax-exempt status. (Exhibit C to Donaphon affidavit.)

---

1. The second count of the complaint relates to a defendant who has been dismissed by consent order.

In response, plaintiffs contend that defendant Elwyn is not immune because it is a Pennsylvania corporation and therefore is not protected by New Jersey's law on charitable immunities. Essentially, plaintiffs argue that Pennsylvania law should govern the immunity, if any, of Pennsylvania corporations, and they point out that in Pennsylvania the doctrine of charitable immunity has been abolished. *Flagiello v. Pennsylvania Hospital,* 417 Pa. 486, 208 A.2d 193 (1965). Plaintiffs argue further that AIMS functionally operates as a branch of Elwyn and therefore should be governed by Pennsylvania law also.

As a federal court sitting in diversity, this court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New Jersey courts have adopted the governmental interest analysis approach for resolving conflict of law problems. *Mellk v. Sarahson,* 49 N.J. 226, 229 A.2d 625 (1967). Under this approach,

> [t]he court determines first the governmental policies evidenced by the laws of each related jurisdiction and second the factual contacts between the parties and each related jurisdiction. A state is deemed interested only where application of its laws to the facts will foster that state's policy.

*Henry v. Richardson-Merrell, Inc.,* 508 F.2d 28, 32 (3d Cir.1975). The contacts that are considered in determining which state's law should apply include:

> (a) the place where the injury occurred;
> (b) the place where the conduct causing the injury occurred;
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and
> (d) the place where the relationship, if any, between the parties is centered.

*Wuerffel v. Westinghouse Corporation,* 148 N.J.Super. 327, 334, 372 A.2d 659 (Law Div.1977), *quoting Restatement, Conflict of Laws* 2d, § 145 at 414 (1971).

Plaintiffs contend that Pennsylvania law should control the issue of Elwyn's immunity because New Jersey has no interest in shielding a Pennsylvania corporation from liability, whereas Pennsylvania does have an interest in making its corporations accountable for their actions. Plaintiffs also contend that Pennsylvania is the forum with the most significant contacts with respect to the issue presented. They argue that AIMS is functionally a part of Elwyn because the two corporations have interlocking officers and directors, because Elwyn recently acquired all of the real property of AIMS, and because Elwyn extended a line of credit to AIMS. Accordingly, they contend that AIMS is simply "a branch of Elwyn, i.e., a New Jersey location of a Pennsylvania corporation," (plaintiffs' supplemental brief, p. 2), and therefore that the significant decisions that led to plaintiff's injuries emanated from Pennsylvania.

Defendant Elwyn argues, by contrast, that New Jersey law should apply because New Jersey has a strong interest in encouraging foreign nonprofit corporations to operate in the state. Elwyn also contends that New Jersey is the forum with the most significant contacts inasmuch as the injury occurred in New Jersey, the allegedly negligent conduct occurred in New Jersey, plaintiff was a New Jersey resident, and the relationship between plaintiff and Elwyn was centered in New Jersey.

Turning first to the question of whether New Jersey or Pennsylvania has a greater interest in having its law apply, we note that the charitable immunity statute, by its terms, does not indicate whether its reach was intended to be limited to domestic corporations. Moreover, there are surprisingly few cases on this issue. In *Wuerffel, supra,* the plaintiff, a New Jersey resident, was an engineering student at Drexel University, a Pennsylvania nonprofit corporation. As part of his training, plaintiff was placed, by the University, in a job in Burlington, New Jersey, where he was injured. Drexel argued that it was immune from liability under New Jersey's charitable immunity statute. The court disagreed, finding that Pennsylvania law should govern the status of the Pennsylvania corporation, because Pennsylvania had a greater inter-

est in holding its corporations accountable for their negligent conduct. It explained:

> The State of New Jersey would have no prevalent policy considerations of protecting a foreign corporation from suit when the state of incorporation does not grant that protection.

> Drexel's expectations as a corporation of a state which does not grant charitable immunity must be that it must compensate those who are injured by its negligent acts and therefore is insured for this purpose.

*Id.* at 335.

Similarly, in *Prince v. Trustees of University of Pennsylvania*, 282 F.Supp. 832 (E.D.Pa.1968), the court, applying Pennsylvania's "interest analysis" conflicts of laws test, held that Pennsylvania law would control the issue of a Pennsylvania hospital's liability limitations in a medical malpractice action brought by a New Jersey plaintiff.[2] In reaching this conclusion, the court noted that New Jersey had no interest in limiting the liability of a foreign corporation and suggested that "New Jersey was only empowered to legislate with respect to New Jersey charities." *Id.* at 837.

Finally, in *Feniello v. University of Pennsylvania Hospital*, 558 F.Supp. 1365 (D.N.J.1983) (Cohen, J.), the court was faced with the identical factual situation as that of *Prince, supra.* The plaintiff, a New Jersey resident, brought a medical malpractice action against the University of Pennsylvania Hospital, and the Hospital argued that its liability was limited under New Jersey's charitable immunities statute. The *Feniello* court did not reach the conflict of laws question, however, holding that even if New Jersey substantive law did apply, the immunity statute could not apply to "charitable institutions operating wholly outside of the state." *Id.* at 1368. In reaching this conclusion, it rejected the defendant's contention that it was entitled to the benefits of the New Jersey statute because it had close connections to New Jersey and served New Jersey residents. The court explained:

> Although HUP may provide substantial services to New Jersey residents, the institution was incorporated in Pennsylvania and performs all of its functions therein. Any connection between HUP and New Jersey which does not include incorporation or operation within the state is insufficient to bring the hospital under the purview of the statute.

*Id.* The court also rejected the defendant's argument that the Supreme Court's decision in *WHYY v. Glassboro*, 393 U.S. 117, 89 S.Ct. 286, 21 L.Ed.2d 242 (1968) (*per curiam*) mandated the application of New Jersey's immunity law. In *WHYY*, the Court held that a New Jersey statute which denied a tax exemption to nonprofit foreign corporations transacting business in New Jersey violated the Equal Protection Clause of the 14th Amendment. The *Feniello* court distinguished *WHYY*, noting,

> It is apparent from the language in *WHYY* that the holding in that case did not extend to organizations which have no facilities in New Jersey. Indeed, as indicated in *Prince*, it is doubtful that New Jersey has authority to legislate with respect to entities operating outside of the state.

*Id.*

We believe that none of the three above-cited cases are precisely on point with the situation presented here. In all three of the cases, the Pennsylvania corporations at issue operated wholly within Pennsylvania, and the contacts with New Jersey occurred because New Jersey residents voluntarily availed themselves of the Pennsylvania corporation's services *within Pennsylvania.* In other words, while the Pennsylvania nonprofit corporations in *Wuerffel, Prince,* and *Feniello* may have provided services to New Jersey residents, they did so in Pennsylvania. This point was emphasized in *Feniello,* where the court found that New Jersey had no power, and implicitly no interest, in legislating "with respect to enti-

---

**2.** The New Jersey statute at issue in *Prince,* N.J.S.A. 2A:53A–8, qualifies the broad grant of immunity to charitable nonprofit corporations contained in N.J.S.A. 2A:53A–7 and provides that nonprofit corporations organized exclusively for hospital purposes can be liable in damages for an amount not to exceed $10,000.

ties operating outside of the state." *Feniello, supra,* at 1368.

By contrast, in the present case, there is substantial evidence of record that Elwyn conducts nonprofit activities within the State of New Jersey pursuant to its Management Services Agreement with AIMS, although there is some dispute as to whether AIMS is technically a "facility" of Elwyn's. (*Compare* deposition testimony of Dr. Marvin Kivitz, Tr. 5:21–6:1, and Mr. John Donaphon, Tr. 64:21–65:8 with deposition testimony of Mr. Albert Bussone, Tr. 105:19–21.) AIMS is listed as an Elwyn program location in Elwyn's annual report, with the qualification that "Management [is] in cooperation with Elwyn Institutes." (Kivitz deposition, Tr. 135:5–25.) Moreover, there is evidence that Elwyn provided numerous services, in terms of management and training, at the New Jersey institution. For example, Dr. Marvin Rosen, the Vice President for Research at Elwyn, testified at his deposition that he worked on fund-raising and grant proposals for AIMS, and that he organized two professional conferences, at AIMS, in order to facilitate plans for the development of the AIMS facility. (Rosen deposition, Tr. 147:15–149:16.) The President of Elwyn, Dr. Kivitz, also served as the President of AIMS and, in the latter capacity, had authority to make certain decisions concerning personnel and day-to-day operations. (Kivitz deposition, Tr. 53:15–54:2; Tr. 56:6–11.) In addition, while the finances of the two corporations were segregated, Mr. Donaphon, Elwyn's Vice President of Finance and AIMS' Assistant Treasuer, prepared both corporations' financial statements and tax returns. (Donaphon deposition, Tr. 60:10–18.) Elwyn also prepares the AIMS payroll. (Donaphon deposition, Tr. 88:22–89:2.) In addition, AIMS and Elwyn have interlocking officers and employees, many of whom are paid by Elwyn, but volunteer their services to AIMS. (Donaphon deposition, Tr. 75:15–81:17.) Finally, we note that Elwyn did not earn a profit, or receive compensation over its actual costs, for the services it provided to AIMS under the Management Services Agreement. (Donaphon deposition, Tr. 82:16–25.)

■ In short, a fair reading of the record indicates that Elwyn does conduct its activities in the State of New Jersey. Under these circumstances, we see no reason why the accident of having been incorporated in Pennsylvania should affect Elwyn's immunity status with respect to charitable functions that it performed in New Jersey. We agree with defendants that New Jersey has an interest in extending the protection of the charitable immunities statute to such foreign corporations, as well as domestic nonprofit charitable institutions, in order to encourage all of them to operate within the state for the benefit of New Jersey residents, and to protect them from potentially devastating damages verdicts. Our analysis in this regard is consistent with Judge Cohen's decision in *Feniello, supra,* where, as we discussed earlier, the court suggested that New Jersey's charitable immunity statute would apply to corporate activities occurring within this state. Thus, insofar as the governmental interest prong of the choice of law test is concerned, we find that New Jersey's interest in encouraging and supporting charitable nonprofit activities within the state outweighs any interest that Pennsylvania might have in holding one of its corporations accountable for conduct occurring outside of that state's boundaries.

Turning to the second prong of the test, we find that New Jersey is the state with the most significant contacts with the parties. Plaintiff's injury occurred in New Jersey, and plaintiff's relationship with the defendants was centered in New Jersey, at AIMS, an institution over which Elwyn exercised significant control. Moreover, to the extent that Elwyn can be held liable at all for plaintiff's injuries, it is due to Elwyn's management of, control over, and/or activities undertaken in connection with, the New Jersey institution.

For all of the reasons set forth above, we find that under the governmental interest choice of law test, New Jersey's law should apply to the issue of Elwyn's immunity from liability. In addition, having determined that New Jersey's substantive law will govern this issue, we also find, under

the standard set forth in *Feniello, supra,* that Elwyn has operations within the state and thus comes within the purview of N.J.S.A. 2A:53A–7.

■ Plaintiffs argue next that summary judgment on the charitable immunity issue must be denied because there exists a genuine issue of material fact with respect to whether AIMS and Elwyn are "nonprofit corporation[s] ... organized exclusively for religious, charitable, educational or hospital purposes," as required by N.J.S.A. 2A:53A–7. We disagree.

In support of their motion, defendants have submitted the affidavits of Donaphon and David R. Carson, the Director of Insurance and Business Services for Elwyn and AIMS. Both men state, based on their research and personal knowledge, that AIMS and Elwyn are nonprofit corporations. This contention is born out by the Certificates of Incorporation submitted in connection with the affidavits. It appears from AIMS' Certificate of Incorporation that AIMS was incorporated pursuant to N.J.S.A. 15A:1–1, (Exhibit A–76 to Donaphon's affidavit), which provides for the creation of nonprofit corporations. Similarly, it appears that Elwyn is treated as a nonprofit corporation pursuant to 15 Pa. C.S. § 7901 *et seq.* (Exhibit C–13 to Carson's affidavit.) In addition, defendants point to recent correspondence from the United States Internal Revenue Service to the effect that both corporations enjoy tax-exempt status, pursuant to 26 U.S.C. § 501(c)(3), as nonprofit corporations. In short, we find that the record supports the defendants' contention that they are nonprofit corporations. As plaintiffs have failed to produce any evidence, even after extensive discovery on this issue, that would cast doubt on defendants' asserted nonprofit status, we find that there exists no genuine issue of material fact with respect to this question.

We also find that both AIMS and Elwyn were organized exclusively for a combination of charitable, educational and hospital purposes. AIMS' Certificate of Incorporation provides that "the purposes for which this Association is formed are the study, care, training, maintenance and education of those whose minds have not developed normally." (*E.g.,* Exhibit A59 to Donaphon affidavit.) According to Donaphon, AIMS "operates and maintains a long-term care facility for mentally handicapped, mentally retarded and developmentally disabled children and adults. It provides an educational program and training for its residents." (Donaphon affidavit, ¶ 3.) Similarly, the Act providing for Elwyn's incorporation states that the purpose of the corporation "shall be the mental, moral and physical education of idiotic and feeble-minded children ..." (Exhibit B1 to Donaphon affidavit), and Donaphon states in his affidavit that Elwyn also operates long-term care facilities for mentally disabled people. (Donaphon affidavit, ¶ 4.) We believe, and plaintiffs do not appear to dispute, that these purposes as expressed in the defendants' corporate charters and evidenced by their activities, are manifestly charitable, educational and hospital as required by the charitable immunity statute.

Plaintiffs contend, nevertheless, that there exists a genuine issue of material fact with respect to whether Elwyn is organized *exclusively* for eleemosynary purposes. They point out that it appears from Donaphon's deposition testimony that Elwyn has two wholly-owned profit-making subsidiaries. Plaintiffs do not explain, however, how Elwyn's ownership of these subsidiaries affects its corporate purpose or its entitlement to immunity under the statute. It is clear that a nonprofit corporation organized exclusively for charitable, educational or hospital purposes may come within the purview of N.J.S.A. 2A:53A–7 even though it has profit-making operations. *See Kasten v. YMCA,* 173 N.J.Super. 1, 412 A.2d 1346 (App.Div.1980). The question in such a situation is " 'whether the institution pleading the immunity, at the time in question, was engaged in the performance of the charitable objectives it was organized to advance,' and whether plaintiff then was truly a beneficiary thereof." *Sommers v. Union Beach First Aid Squad,* 139 N.J.Super. 425, 431, 354 A.2d 347 (App.Div.1976), *quoting Anasiewicz v. Sacred Heart Church,* 74 N.J.Super. 532,

536, 181 A.2d 787 (App.Div.1962). In the present case, plaintiffs do not dispute that Fred Seiderman was injured by Elwyn's activities, and not those of its profit-making subsidiary. Accordingly, the fact that Elwyn owns profit-making subsidiaries is not material, inasmuch as there is no dispute that Elwyn was engaged in the performance of its charitable objectives, and that plaintiff was a beneficiary thereof at the time of his injury.

Plaintiffs offer no other arguments, nor produce other evidence, to refute defendants' contentions, which are supported by affidavits and other documentation, that they are nonprofit corporations organized exclusively for purposes covered under N.J.S.A. 2A:53A–7. We note that defendants' motion for summary judgment had been adjourned to allow plaintiffs to conduct discovery on this issue, and that the discovery is now complete. Based on the record before us, for the reasons set forth above, we find that defendants have carried their burden of establishing that they are covered by N.J.S.A. 2A:53A–7, and that plaintiffs have failed to produce any evidence to create a genuine issue of material fact with respect to this issue.

Having determined that AIMS and Elwyn are entitled to immunity under N.J.S.A. 2A:53A–7, we must determine the scope of that immunity and whether it applies to all of the claims alleged in the complaint. Plaintiffs point out that the statute by its terms refers only to "negligence" and argue, therefore, that AIMS and Elwyn are not immune from liability for their allegedly grossly negligent, wanton and willful misconduct. In response, defendants point to the legislative admonition, contained in N.J.S.A. 2A:53A–10, that the statute "shall be deemed to be remedial and shall be liberally construed so as to afford immunity to the said corporations ... from liability as provided herein in furtherance of the public policy for the protection of nonprofit corporations, societies and associations organized for religious, charitable, educational or hospital purposes." Defendants contend that the remedial purposes of the statute will best be achieved by according immunity to all forms of negligent conduct.

This court's research has revealed no New Jersey cases precisely on point. In fact, the New Jersey Supreme Court recently declined to rule on the issue in *Schultz v. Roman Catholic Archdiocese of Newark,* 95 N.J. 530, 538–539, 472 A.2d 531 (1984). It explained:

> We agree that a statute should be construed in light of probable legislative intent in the context of an evolving common law.... We see no evolution of common law doctrine that conflicts with the original legislative policy insofar as ordinary negligence of a charity's employees is involved. Courts have questioned whether the statute applies in cases of strict liability.... Whether immunity should cloak those with a reckless or gross disregard for the safety of others in a question that may have to be addressed.... Perhaps the time has come for the Legislature to consider again the scope of the law and its intended application to new theories of liability....

(Citations omitted.) Although the New Jersey Supreme Court avoided the question that is presently confronting this court, we find its discussion of the statute to be instructive. The Supreme Court pointed out that in construing the scope of the charitable immunity statute, a court must attempt to divine the Legislature's intent from the common law doctrines that existed at the time the statute was enacted. *See also Jerolamon v. Fairleigh Dickinson University,* 199 N.J.Super. 179, 182, 488 A.2d 1064 (App.Div.1985) ("It was not the intent of the Legislature to change the preexisting immunity but merely to preserve it as it had previously existed.")

As the starting point for our analysis, we note that "New Jersey has long recognized the distinction between willful and wanton conduct on the one hand and mere negligence on the other." *Foldi v. Jeffries,* 93 N.J. 533, 549, 461 A.2d 1145 (1983). As the New Jesey Supreme Court recently explained:

This Court has consistently recognized the importance of the distinction between willful and wanton conduct and ordinary negligence....

The difference between an intentional act and willful and wanton misconduct is merely one of degree. For an act to be intentional, the actor must intend the harm or realize with substantial certainty that harm is likely to result. For an act to constitute willful and wanton misconduct, the act must be intended, but not the resulting harm; the actor need only 'realize[ ] ... that there is a strong probability that harm may result.' *Restatement (Second) of Torts*, § 500(f)....

*Mahoney v. Carus Chemical Co., Inc.,* 102 N.J. 564, 574, 510 A.2d 4 (1986). In *Mahoney,* the court held that the immunity of the so-called "firemen's rule" did not extend to wanton and willful misconduct. In reaching this conclusion, it emphasized that the distinction between negligence and wanton and willful conduct had been understood as early as 1922, *Staub v. Public Sev. Ry. Co.,* 97 N.J.L. 297, 299–300, 117 A. 48 (E. & A. 1922). The court also noted that it had recognized such an exception in the context of other immunity doctrines, *Foldi, supra* (parental immunity), although it conceded that it had left "unsettled [the charitable immunity statutes'] application to acts of reckless misconduct." *Mahoney, supra,* at 576, 510 A.2d 4.

We are persuaded, from these cases, that the historic distinction between wanton and willful conduct and mere negligence is a real and important principle in New Jersey law. The distinction between those types of conduct was recognized as early as 1922, well before the Legislature enacted the charitable immunity statute in 1958. Accordingly, we believe that when the Legislature spoke of "negligence" in the charitable immunity statute, it did not intend to encompass an entirely separate type of conduct—gross negligence or wanton or willful conduct. Thus, despite the Legislature's mandate that the statute should be construed liberally, we believe that if the New Jersey Supreme Court were squarely confronted with the issue, it would find, based on its repeated emphasis on the distinction between these types of conduct, that the statute does not extend immunity to acts constituting gross negligence or wanton or willful conduct.

For all of the foregoing reasons, the motion for summary judgment by defendants AIMS and Elwyn will be granted with respect to plaintiffs' claims of ordinary negligence, and denied with respect to plaintiffs' claims of gross negligence and wanton or willful conduct.