693 A.2d 520

ROSEANNE BUTKERA, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR ALANA BUTKERA, AN INFANT, PLAINTIFFS–APPELLANTS, v. HUDSON RIVER SLOOP "CLEARWATER", INC., WARREN BOARD OF EDUCATION AND WARREN TOWNSHIP SCHOOL DISTRICT, JOINTLY, SEVERALLY OR IN THE ALTERNATIVE, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 29, 1997—Decided May 12, 1997.

Before Judges PRESSLER, HUMPHREYS and WECKER.

*Kathleen P. Garvey* argued the cause for appellants (*Libero D. Marotta*, attorney; *Mr. Marotta*, on the brief).

*James S. Cramer* argued the cause for respondent Hudson River Sloop "Clearwater," Inc. (*Tansey, Fanning, Haggerty, Kelly, Convery & Murray*, attorneys; *Mr. Cramer*, of counsel and on the brief).

*Grace A. King* argued the cause for respondents Warren Board of Education and Warren Township School District (*Passman, Dougherty & Zirulnik*, attorneys; *Ms. King*, on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Alana Butkera, then a nine-year old fourth-grader, went on a school-supervised excursion on the sloop Clearwater, which plies the Hudson River in its educational mission. The boat docked on its return in Jersey City and, as Alana was disembarking, she fell into an open hatch and sustained injuries. Her mother, plaintiff Roseanne Butkera, both individually and as Alana's guardian, brought this action against The Hudson River Sloop "Clearwater," Inc. (Clearwater), the owner and operator of the sloop, and against the Warren Board of Education and Warren Township School District, alleging that their joint and several negligence caused Alana's injury. Both defendants successfully moved for summary judgment, the Clearwater on the ground of charitable immunity afforded by *N.J.S.A.* 2A:53A–7, and the school board on the ground that plaintiff had failed to show a permanent injury as required by the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1, *et seq.*, 59:9–2 d. Plaintiff appeals. We are satisfied that neither defendant was entitled to summary judgment, and accordingly, we reverse.

With respect to the charitable immunity defense, it is not disputed that Clearwater is a charitable corporation incorporated under the laws of New York in 1966, whose purpose, as stated by its certificate of incorporation, is

> [t]o acquaint people with matters relating to our cultural heritage; and to maintain and promote interest in the history of the Hudson River both as a commercial and pleasure artery; and in connection therewith to build, own, operate and exhibit

replicas of the great sloops which once freely navigated the river, thereby generating a greater interest in our cultural heritage and an understanding of the contributions made to our culture and commerce by the river and the sloops which sailed it.

The certificate of incorporation also provides that "[t]he territory in which its operations are principally to be conducted is the State of New York, but it may also engage in operations elsewhere in the United States." It is also common knowledge that Clearwater has engaged in activities designed to promote and protect the environmental quality of the Hudson River. And it is undisputed that Clearwater's offices are in New York, that the sloop's home dock is in New York in the City of Poughkeepsie, and that the sloop plies both New York and New Jersey waters and docks on the shores of both.

The crux of the charitable-immunity problem is that while New Jersey continues by statute to afford that immunity, New York had abrogated the common-law immunity by decision of its highest court almost ten years before Clearwater's incorporation, *Bing v. Thunig*, 2 *N.Y.*2d 656, 163 *N.Y.S.*2d 3, 143 *N.E.*2d 3 (1957), and the immunity has not since been restored. It is conceded that Clearwater is a charity as defined by *N.J.S.A.* 2A:53A–7 and that at the time of the accident, Alana was a beneficiary thereof. Thus it is clear that if the New Jersey law of charitable immunity applies, this action must fail, but if New York law applies, it may go forward.

■ We are satisfied that the choice of New York law is dictated by application of the governmental-interest test which informs this jurisdiction's resolution of choice-of-law issues, *see, e.g., Gantes v. Kason Corp.*, 145 *N.J.* 478, 484, 679 *A.*2d 106 (1996); *Veazey v. Doremus*, 103 *N.J.* 244, 247, 510 *A.*2d 1187 (1986). As explained by *Gantes, supra*, 145 *N.J.* at 485, 679 *A.*2d 106, the object of the governmental-interest analysis is to determine, based on the policies underlying the respective law of each state and the significance of its respective contacts with the litigation, which state, in the circumstances, has the paramount interest in the enforcement of its law respecting the specific issue in question.

Delineation of the contacts is a simple matter. Plaintiff is domiciled in New Jersey and the accident occurred in this state, although the activity out of which the accident resulted took place in both New York and New Jersey. Defendant is domiciled in New York and operates out of New York, conducting activities in both states. We think it plain, and *Gantes* indeed instructs, that the combined facts of plaintiff's domicile and the situs of the accident may not be dispositive in a governmental-interest analysis but, rather, may have to yield to the policy interests of defendant's home state. This is particularly so if the home state's policy is to ensure the accountability in tort of its domiciliaries for the consequences of their negligent conduct. Thus in *Gantes, supra*, 145 *N.J.* at 482–484, 679 *A.*2d 106, a products liability case, the plaintiff's decedent was a Georgia resident mortally injured in Georgia as a result of the alleged defect in a machine manufactured in New Jersey by a New Jersey corporation, initially sold to a consumer in Pennsylvania, and some years later resold to the decedent's employer in Georgia. Application of Georgia's statute of limitations would have barred the action, which was still viable under New Jersey's statute of limitations. *Id.* at 485, 679 *A.*2d 106. The Supreme Court noted that New Jersey's only "interest implicated by its contacts with the parties is that derived from the status of defendant as a domestic manufacturer," *Id.* at 488, 679 *A.*2d 106. The Court held that that interest was nevertheless a substantial one because it involved the significant policy of the defendant's home state to deter conduct by its domiciliaries that creates an unreasonable risk of harm to others. *Id.* at 489, 679 *A.*2d 106. As the Court observed, it

has recognized generally that a purpose of the tort laws is to encourage reasonable conduct, and conversely, to discourage conduct that creates an unreasonable risk of injury to others.... That deterrent goal of the tort laws is effectuated through the recognition of a duty to exercise reasonable care and the imposition of liability for the breach of such a duty. [Citations omitted.]

*[Ibid.]*

The Supreme Court concluded, moreover, that where the conflicts issue implicates the accountability to tort liability of the defendant, the defendant's home state has not only a cognizable interest but

also the paramount interest in its law being enforced, provided only that application of its law does not substantially offend the governmental interest of any other state having significant contact with the litigation and whose law would preclude that accountability. *Id.* at 493, 679 *A.*2d 106.

We are persuaded that the *Gantes* analysis controls here. As we have pointed out, New York has long since abrogated the common-law charitable immunity on the ground that charities must "shoulder the responsibilities borne by everyone else." *Bing, supra,* 163 *N.Y.S.*2d at 11, 143 *N.E.*2d at 8. And that is so, the court held, because insistence that charities be liable in tort "serves a two-fold purpose, for it both assures payment of any obligation to the person injured and gives warning that justice and the law demand the exercise of care." *Ibid.* Clearwater was incorporated under New York law after charitable immunity was abrogated. It must, therefore, be deemed to have done so with full knowledge and acceptance of the tort consequences flowing from its negligent actions. We are persuaded that by granting it immunity based simply on the situs of the accident and the domicile of the injured person, we would be undermining the strongly stated and firmly held policy of its home state, New York, without concomitantly advancing or promoting the countervailing policy of this state.

In that regard, we point out that New Jersey's charitable immunity is not absolute. Persons injured by the negligent conduct of charities domiciled in this State are free to sue them in tort provided they are not beneficiaries thereof, and our courts have tended to construe that status narrowly. *See, e.g., Brown v. St. Venantius School,* 111 *N.J.* 325, 544 *A.*2d 842 (1988); *DeVries v. Habitat for Humanity,* 290 *N.J.Super.* 479, 676 *A.*2d 152 (App.Div.1996), *aff'd* 147 *N.J.* 619, 689 *A.*2d 142 (1997); *Glowacki v. Underwood Memorial Hosp.,* 270 *N.J.Super.* 1, 636 *A.*2d 527 (App.Div.1994); *Harrington v. Clara Maass Hosp.,* 208 *N.J.Super.* 365, 506 *A.*2d 26 (App.Div.1986); *Sommers v. Union Beach First Aid Squad,* 139 *N.J.Super.* 425, 354 *A.*2d 347 (App.Div.1976); *Manley v. YMCA,* 275 *N.J.Super.* 656, 646 *A.*2d 1163 (Law Div.

1994). We tend, moreover, to strictly define the status of charities entitled to the immunity. *See, e.g., Snyder v. American Ass'n of Blood Banks,* 144 *N.J.* 269, 305–306, 676 *A.*2d 1036 (1996); *Parker v. St. Stephen's Urban Dev. Corp., Inc.,* 243 *N.J.Super.* 317, 327, 579 *A.*2d 360 (App.Div.1990); *Pelaez v. Rugby Laboratories, Inc.,* 264 *N.J.Super.* 450, 624 *A.*2d 1053 (Law Div.1993); *Allen v. Summit Civic Found.,* 250 *N.J.Super.* 427, 594 *A.*2d 1361 (Law Div.1991). The point of course is clear. Since under New Jersey law charities are not always immune from tort liability and under New York law charities are never immune, New York's policy would be more offended, in the circumstances here, by granting immunity to Clearwater than New Jersey's would be by denying it immunity.

The issue before us is not novel. It was addressed by the Law Division in *Wuerffel v. Westinghouse Corporation,* 148 *N.J.Super.* 327, 372 *A.*2d 659 (Law Div.1977). There, plaintiff, a New Jersey resident, was enrolled in Drexel University, a Pennsylvania educational institution, and was injured in New Jersey while at an industrial job site to which he had been assigned as part of his required participation in a Drexel work program. *Id.* at 329–331, 372 *A.*2d 659. Pennsylvania, like New York, had abrogated charitable immunity. *Id.* at 332, 372 *A.*2d 659. Judge Talbott held that Pennsylvania charitable-immunity law, not New Jersey's, applied despite the New Jersey situs of the accident, because:

> The governmental interest in this case indubitably is the paramount interest of Pennsylvania. Pennsylvania is the place of incorporation of Drexel and certainly has more concern in its rights and obligations than does New Jersey. Pennsylvania has given claimants the right to sue such non-profit corporations and it would seem inappropriate for sister states to deny that public policy evidenced by Pennsylvania law under circumstances such as those here present. This is not a case where New Jersey is attempting to protect its residents to the end that they may recover against a foreign corporation which may have immunity in its own state. The opposite is true. Applying New Jersey law would defeat the rights of a New Jersey resident without benefitting the policy of the foreign jurisdiction.

> . . . .

> Drexel's expectations as a corporation of a state which does not grant charitable immunity must be that it must compensate those who are injured by its negligent acts and therefore is insured for this purpose.

We are in full agreement with this well reasoned analysis, which was subsequently followed by the Federal District Court for this District. *See Feniello v. University of Pennsylvania Hosp.,* 558 *F.Supp.* 1365, 1368 (D.N.J.1983). We are aware that a different result was reached in *Seiderman v. American Institute for Mental Studies,* 667 *F.Supp.* 154 (D.N.J.1987), but we disagree with its rationale to the extent it relied on the situs of the accident as the critical factor in the governmental interest analysis. *Cf. Schultz v. Boy Scouts of America, Inc.,* 65 *N.Y.*2d 189, 491 *N.Y.S.*2d 90, 480 *N.E.*2d 679 (1985) (where a tort was committed in New York against New Jersey residents by employees of charitable corporations domiciled in New Jersey, New Jersey law on charitable immunity applied rather than New York law).

In sum, we hold that under the circumstances of this case, New York law applies. Clearwater is not entitled to immunity from liability under New Jersey's charitable immunity law.

We now address the summary judgment in favor of the school district. *N.J.S.A.* 59:9–2 d provides that a claim for pain and suffering is maintainable against a public entity only if the injury complained of constitutes "permanent loss of a bodily function, permanent disfigurement or dismemberment" and the medical treatment expenses exceed $1,000. The permanent injury must, moreover, be demonstrated by objective medical evidence. *See Thorpe v. Cohen,* 258 *N.J.Super.* 523, 529, 610 *A.*2d 878 (App.Div. 1992). There was certainly a sufficient showing here that the medical-treatment expense threshold had been met. The claim was dismissed on the basis that there was no *prima facie* showing of permanent injury.

We agree with the defendant that plaintiff's showing was thin. We do not agree, however, that it was so deficient as to warrant dismissal of her action. Plaintiff's claim is that her daughter sustained permanent soft-tissue injury of the cervical and lumbar spine which has caused both chronic back pain and recurring headaches since the accident. A 1994 MRI showed a

bulging disc at C5–6. Her treating orthopedist apparently attributed both the bulge and the pain to the Clearwater accident. A neurologist, Dr. Michael Kailas, reviewed all of Alana's medical records and gave a report just prior to the return date of the summary judgment. According to Dr. Kailas, there were previous scans that he had not reviewed as well as an early MRI of the cervical spine which "revealed straightening of the spine secondary to muscle spasm." He also opined as follows:

> From reviewing the above summarized material, and in reading the extensive neurologic exams performed by Dr. Molofsky, it is my opinion that the patient did receive significant injuries as a result of her accidental fall on 10/31/89. The most significant injury sustained by the patient was a cervical spine sprain with myofascitis which lead to a premature degeneration of the C5 disc and its subsequent bulging. A young person of nine years old does not have a degenerated disc, especially in the cervical spine unless significant trauma had occurred and served as its cause. In this case, the patient had a sufficient fall with a sufficiently severe impact to cause a premature degeneration of the disc in question along with its progression in a bulging annulus. As Dr. Molofsky states, this is a permanent injury which will require further follow up on a periodic basis so that caution is rendered to make sure that this does not further progress into a herniated disc with focal neurological deficits. According to Dr. Molofsky the patient is without any significant focal neurological deficits except for restricted range of motion. This is a permanent structural consequence of the accident and is both temporally and causally related to the accident. Since this, like many other disease processes, is a dynamic process, it needs to be followed so that its fullest expression can be quickly diagnosed and then quickly treated when it should occur.

Defendant asserts that Dr. Kailas' report is inadequate because he never examined the child but only her records. It was represented to us at oral argument that plaintiff had insufficient time prior to the return date of the summary judgment motion to arrange for examination of the child. Since Dr. Kailas' objective findings and conclusions based thereon would, in our view, be sufficient to sustain the action against a summary judgment motion if confirmed by his examination of the child, and because we are dealing here with infant's rights and a statute of limitations which has not yet run against her, we are satisfied that the interests of justice require affording plaintiff an opportunity to have Dr. Kailas examine the child and report as to whether that examination confirms the findings and opinions expressed by him in his original report. The trial court shall enter an appropriate

order extending discovery for that purpose, and defendant will be, of course, free to renew the summary judgment motion thereafter.

The summary judgments appealed from are reversed, and we remand to the trial court for further proceedings consistent with this opinion.