Laird DOCTOR and Linda
Doctor, Appellants,

v.

Howard E. PARDUE and Experimental
Aircraft Association, Inc.,
Appellees.

No. 01–03–00899–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Sept. 15, 2005.

Rehearing Overruled March 9, 2006.

See also 76 S.W.3d 496.

**6**

Dana R. Allison, Brownsville, Lance H. Lubel, Heard, Robins, Cloud, Lubel, & Greenwood, L.L.P., Houston, Guy H. Allison, The Allison Law Firm, Corpus Christi, Linda L.S. Moroney, Sharon S. McCally, Storey, Moore & McCally, P.C., JoAnn Storey, JoAnn Storey, P.C., Houston, for Appellants.

Jeffrey J. Putnam, Mark Cohen, Cohen, Gorman & Putnam, L.L.P., Houston, Robert F. Ruckman, David T. Moran, Jackson Walker L.L.P., Dallas, Frank G. Vlahakos, Richard E. Griffin, Jackson & Walker, L.L.P., Houston, for Appellees.

Panel consists of Justices JENNINGS, HANKS, and EVANS.*

## OPINION

TERRY JENNINGS, Justice.

Appellants, Laird Doctor ("Lad") and Linda Doctor, challenge the trial court's judgment entered after a jury trial in their negligence suit against appellees, Experimental Aircraft Association, Inc. ("EAA") and Howard Pardue, for personal injuries that Lad sustained in an airplane collision that occurred in Wisconsin. The Doctors present six issues for our review, seeking a reversal of the trial court's judgment, which ordered that they recover $500,000 from EAA and take nothing from Pardue. The Doctors contend that the trial court erred in concluding that Texas was the state with the most significant relationship to the issue of charitable immunity and in applying the Texas Charitable Immunity and Liability Act (the "Act")[1] to limit their award against EAA and to completely immunize Pardue. The Doctors also contend that the evidence is factually insufficient to support the jury's findings of zero damages for Lad's past and future physical pain and mental anguish, past and future disfigurement, and past and future physical impairment; zero damages for Lad's past medical expenses; $2.5 million in damages for Lad's future medical expenses; zero damages for Linda's past loss of consortium; and $50,000 for Linda's future loss of consortium.

We reverse and remand for a new trial.

### Factual and Procedural Background

EAA, a not-for-profit charitable corporation incorporated under the laws of Wisconsin, maintains its principal place of

---

* The Honorable Frank G. Evans, retired Chief Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

1. TEX. CIV. PRAC. & REM.CODE ANN. §§ 84.001–.008 (Vernon Supp.2004–2005).

business in Wisconsin. Although it is not registered to do business in Texas, EAA is subject to the general jurisdiction of Texas courts.[2] EAA is an organization dedicated to preserving the grassroots aspect of aviation and encouraging families and children to become interested in aviation. It assists governmental agencies in the development of aviation activities and promotes and encourages aviation safety, aviation research and development, and non-commercial aviation. Every year, EAA hosts a convention and sponsors an air show, known as "AirVenture," in Oshkosh, Wisconsin.

In July 1999, Lad was rendered a quadriplegic at the air show when the vintage World War II Corsair aircraft that he was piloting collided on the runway with another aircraft piloted by Pardue. At the time of the collision, Lad was working as a professional pilot and an employee of the Corsair's owner, the Cavanaugh Flight Museum ("CFM"), located in Addison, Texas. Pardue was piloting an aircraft owned by the Breckenridge Air Museum ("BAM"), a charitable organization located in Breckenridge, Texas, and he was serving as a BAM volunteer. Lad and Pardue, both Texas residents, attended the air show in Wisconsin to exhibit the aircrafts on behalf of their respective organizations.

The Doctors sued EAA and Pardue for negligence, seeking damages "under the laws of the State of Texas." EAA filed a motion for partial summary judgment seeking a ruling that, based on the Act, its liability to the Doctors was limited to $500,000. Pardue also filed a motion for partial summary judgment seeking a ruling that, based on the Act, as a volunteer

he was entitled to absolute immunity from liability for the Doctors' injuries. The Doctors then filed an amended petition asserting that Wisconsin law should govern the issue of charitable immunity. EAA and Pardue also filed pretrial motions for determination of applicable law, arguing that Texas law should govern and that the Act should apply. The trial court carried these motions through trial.

The jury, finding that the negligence of EAA, Pardue, and Lad proximately caused the collision, attributed 25% of the negligence to EAA, 25% of the negligence to Pardue, and 50% of the negligence to Lad. The jury awarded zero damages for Lad's past and future physical pain and mental anguish, past and future disfigurement, past and future physical impairment, and past medical expenses; $2.5 million in damages for Lad's future medical expenses; zero damages for Linda's past loss of consortium; and $50,000 for Linda's future loss of consortium. The jury further found that, at the time of the collision, EAA was a charitable organization and that Pardue was acting in good faith and in the course and scope of his duties and functions as a volunteer of a charitable organization. Based on these findings, the trial court applied the limitations set forth in the Act and rendered final judgment that the Doctors recover $500,000 from EAA and take nothing from Pardue.

### Choice of Law

In their fifth issue, the Doctors argue that the trial court erred in applying the Act to limit EAA's liability because Wisconsin had the most significant relation-

---

2. EAA previously filed a special appearance in this case objecting to personal jurisdiction in Texas. The trial court denied EAA's special appearance. Our sister court affirmed the trial court's denial of EAA's special appearance, noting that "EAA has purposefully es-

tablished sufficient contacts with Texas" to support the trial court's finding of general jurisdiction over EAA. *Experimental Aircraft Ass'n, Inc. v. Doctor*, 76 S.W.3d 496, 509 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

ship to the charitable immunity issue as EAA[3] is a Wisconsin organization, the acts and omissions underlying the jury's negligence finding occurred in Wisconsin, and the crash and resultant injury occurred in Wisconsin. The Doctors also argue that if the trial court's application of the Act is affirmed by this Court, Texas corporations will lose the protections provided under the Act when sued in foreign states by foreign plaintiffs, even for injuries arising out of charitable services performed in Texas.

The determination of which state's law applies is a question for the court. *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 848 (Tex.2000). Therefore, we must review the trial court's decision to apply Texas law to this case de novo. *Minn. Mining & Mfg. Co. v. Nishika Ltd.,* 955 S.W.2d 853, 856 (Tex.1996); *Tracker Marine, L.P. v. Ogle,* 108 S.W.3d 349, 352 (Tex.App.-Houston [14th Dist.] 2003, no pet.). Texas courts use the "most significant relationship" test to decide choice of law issues. *Torrington Co.,* 46 S.W.3d at 848; *Hughes Wood Prods., Inc. v. Wagner,* 18 S.W.3d 202, 205 (Tex.2000); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6, 145 (1971). Under that test, a court must consider which state's law has the most significant relationship "to the particular substantive issue to be resolved." *Hughes Wood Prods., Inc.,* 18 S.W.3d at 205.

EAA argues that the trial court correctly applied the Act to reduce the jury's damages award to $500,000 because Texas is the state with the most significant relationship "to the discrete issue of the amount of compensatory damages" recoverable by the Doctors. EAA asserts that Texas has an overriding interest in reducing the liability exposure and limiting compensatory damage awards against charitable organizations, including those not incorporated in Texas, like EAA. In support of its argument, EAA relies on *Torrington,* in which the plaintiffs argued in favor of application of Texas law on damages, while the defendants argued for application of Michigan law, which did not permit recovery of mental anguish damages, or Nebraska law, which only permitted recovery for pecuniary losses. 46 S.W.3d at 848 n. 16.

However, the issue here, unlike the issue presented to the court in *Torrington,* does not directly relate to the type of damages recoverable by plaintiffs, but instead relates to protections afforded to a certain class of defendants—charities and volunteers, for a certain type of conduct—performance of charitable services. We note that the doctrine of charitable immunity has been treated as an affirmative defense that must be pleaded and proven by parties seeking its application. *See Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999) (stating that immunity from liability, like other defenses to liability, must be pleaded and proven and can be waived); *Shoemake v. Fogel, Ltd.,* 826 S.W.2d 933, 939 (Tex.1992) (stating that governmental immunity and charitable immunity can be waived by failure to assert them as affirmative defenses) (citing *Davis v. City of San Antonio,* 752 S.W.2d 518, 520 (Tex.1988)). The central issue disputed by the parties in this case, distinct from the issue in *Torrington,* is whether the trial court properly *limited the liability* of EAA and *completely immunized* Pardue pursuant to the provisions of the Texas

3. On appeal, the Doctors do not dispute the trial court's application of Texas law on the issue of charitable immunity as to Pardue. Rather, they contend that, under the terms of the Act, Pardue was entitled to limited immunity rather than absolute immunity. Accordingly, we address the application of the Act to Pardue separately.

Charitable Immunity and Liability Act. We thus hold that the underlying particular substantive issue presented to this court is one of "charitable immunity."[4]

■ Accordingly, we now consider, under the most significant relationship test, whether the law of Wisconsin or Texas should apply. We begin our choice of law analysis by consulting section 168 of the Restatement of Conflict of Laws, which specifically addresses charitable immunity. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 168 (1971); *see also Hughes Wood Prods., Inc.,* 18 S.W.3d at 206 n. 2 (stating that "[this] Court has often applied more specific sections of the Restatement to address particular choice of law issues"); *Robertson v. Estate of McKnight,* 609 S.W.2d 534, 536 (Tex.1980) (applying section 169 of Restatement to determine choice of law on issue of interspousal tort immunity). Section 168 provides that the law selected by application of section 145 of the Restatement determines the issue of charitable immunity. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 168. The comments to section 168 further provide that the determination of the applicable law should be made in light of the principles set forth in section 6. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 168 cmt. b.

Section 6 sets out the following factors relevant in a choice of law analysis:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of the other interested states and the relative interests of those states in determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability, and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2); *see also Hughes Wood Prods., Inc.,* 18 S.W.3d at 205. In tort actions, the needs of interstate and international systems, the relevant policies of the forum, the relevant policies of other interested states, and the ease in the determination and application of the law to be applied assume greater importance. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. b.

Section 145 states that the following contacts are to be taken into account when applying the principles of section 6 to determine the law applicable to a particular issue:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971). These contacts are to be

4. We recognize that, under the Act, qualifying charities are not absolutely immune, but we still treat the issue as one of "charitable immunity." *See Cox v. Thee Evergreen Church,* 836 S.W.2d 167, 173 n. 10 (Tex.1992) (stating that in cases in which Act is applicable, charitable organizations can "effectively insulate themselves from liability" by maintaining stat-

utorily required levels of insurance); *see also Mason v. S. New England Conference Ass'n,* 696 F.2d 135, 138 (1st Cir.1982); *Edwards v. Our Lady of Lourdes Hosp.,* 217 N.J.Super. 448, 526 A.2d 242, 250 (1987) (describing statute limiting charity's liability as providing "limited charitable immunity").

evaluated according to their relative importance with respect to the particular issue. *Id.* Furthermore, the number of contacts with a state is not determinative. *Torrington Co.,* 46 S.W.3d at 848. Rather, a court must evaluate the contacts in light of the *state policies* underlying the *particular substantive issue. Id.*

█ The facts controlling the choice of law analysis here are largely undisputed. Lad's injury occurred in Wisconsin, as did the conduct causing the injury. *See Experimental Aircraft Ass'n, Inc. v. Doctor,* 76 S.W.3d 496, 504–05 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (agreeing with EAA's contention that there was no evidence to support finding of specific jurisdiction in this case). At the time of the collision, although the Doctors and Pardue were Texas residents, EAA was incorporated in Wisconsin and maintained its principal place of business in Wisconsin.

In regard to the relevant policies of the forum, we note that Texas has abolished the common-law doctrine of charitable immunity. *Howle v. Camp Amon Carter,* 470 S.W.2d 629, 630 (Tex.1971); *Sprague v. Mem'l Baptist Hosp. Sys.,* 580 S.W.2d 1, 2 (Tex.Civ.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.). However, in 1987, the Texas Legislature enacted the Texas Charitable Immunity and Liability Act, limiting the liability of charitable organizations and immunizing volunteers who meet certain conditions. Tex. Civ. Prac. & Rem. Code Ann. §§ 84.001–.008 (Vernon Supp. 2004–2005).[5] Specifically, in any civil action brought against a nonhospital charitable organization for damages based on an act or omission by the organization or its employees or volunteers, the liability of

the organization is limited to a maximum of $500,000 for each person and $1,000,000 for each single occurrence of bodily injury or death. Tex. Civ. Prac. & Rem.Code Ann. § 84.006. The Legislature passed the Act with the following findings and purposes:

(1) robust, active, bona fide, and well-supported charitable organizations *are needed within Texas* to perform essential and needed services;

(2) the willingness of volunteers to offer their services to these organizations is deterred by the perception of personal liability arising out of the services rendered to these organizations;

(3) because of these concerns over personal liability, volunteers are withdrawing from services in all capacities;

(4) these same organizations have a further problem in obtaining and affording liability insurance for the organization and its employees and volunteers;

(5) these problems combine to diminish the *services being provided to Texas and local communities* because of higher costs and fewer programs;

(6) the citizens *of this state* have an overriding interest in the continued and increased delivery of these services that must be balanced with other policy considerations; and

(7) because of the above conditions and policy considerations, it is the purpose of this Act to reduce the liability exposure and insurance costs of these organizations and their em-

---

**5.** A charitable organization is only entitled to the protections afforded under the Act if the organization has liability insurance coverage in effect at the time of the act or omission in the amount of at least $500,000 for each person and $1,000,000 for each single occur-

rence for death or bodily injury. Tex. Civ. Prac. & Rem.Code Ann. § 84.007(g) (Vernon Supp.2004–2005). Thus, a charity that qualifies for protection under the Act cannot be held liable beyond its statutorily required insurance coverage.

ployees and volunteers in order to encourage volunteer services and maximize the resources devoted to delivering these services.

TEX. CIV. PRAC. & REM.CODE ANN. § 84.002 (Vernon Supp.2004–2005) (emphasis added).

Like Texas, Wisconsin has also essentially eliminated common-law charitable immunity. *See Lewis v. Physicians Insur. Co. of Wisconsin*, 243 Wis.2d 648, 627 N.W.2d 484, 492 (2001) (noting that charitable immunity doctrine in Wisconsin is largely defunct); *Szarzynski v. YMCA*, 184 Wis.2d 875, 517 N.W.2d 135, 141 (1994) (citing *Widell v. Holy Trinity Catholic Church*, 19 Wis.2d 648, 121 N.W.2d 249, 251 (1963) (stating that immunity for charitable and religious organizations has been eliminated by courts)). Wisconsin eliminated common-law charitable immunity on public policy grounds. In *Widell*, the Wisconsin Supreme Court stated:

> When an institution owes a duty of care to another and, as a result of carrying on its activities through agents whether the enterprise or activity involves financial gain or not and no matter how lofty the purpose or motive, injures another either directly or through agents the breach of duty ought not be excused or justified on the grounds of the laudable purpose or the public benefit of the activity causing the injury.... Certainly institutions teaching divine justice, the dignity of man and his obligations to his fellowmen and to his Creator would not claim on the basis of their teachings that they ought to be exempt from repairing

the injury done by themselves or their agents to another.

*Id.* at 254; *see also Kojis v. Doctors Hosp.*, 12 Wis.2d 367, 107 N.W.2d 131, 133–34 (1961) (stating that charitable hospitals are no longer civilly immune because they are now "larger in size, better endowed, and on more sound economic basis" and that "insurance covering their liability is available and prudent management would dictate that such protection be purchased"). However, following the elimination of common-law charitable immunity in Wisconsin, the Wisconsin Legislature did not enact laws, similar to those enacted in Texas, insulating charities from liability for injuries arising out of the performance of charitable services.[6]

With these policy considerations in mind, we note that the injury and the conduct occurred in Wisconsin, where EAA is incorporated and maintains its only offices. Also, although EAA maintains contacts with Texas sufficient to support a finding of general jurisdiction, none of its Texas contacts were related to the aircraft collision in this case. We thus conclude that Wisconsin has the dominant public policy interest in determining whether EAA, a not-for-profit charitable organization incorporated under the laws of Wisconsin, should be held immune from tort liability for the collision that occurred in Wisconsin.[7] Applying the protections afforded in the Act to EAA for liability arising from the activities it conducted exclusively in Wisconsin would be contrary to

---

6. Wisconsin does provide a more limited immunity for volunteers. *See* WIS. STAT. ANN. § 181.0670 (2002).

7. We note that if the Doctors shared EAA's Wisconsin domicile, Wisconsin law would likely apply to the issue of charitable immunity, even if the forum of the suit was Texas.

*See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. f (noting that if husband injures his wife in state other than state of couple's domicile, state of couple's domicile is state of dominant interest on issue of whether spouse should be held immune from tort liability for conduct).

the policy of Wisconsin.[8] Wisconsin has expressly stated its policy that charities conducting activities which cause injuries should generally not be immune from liability for those injuries. As for the relevant policies of Texas, we note that although the Act is not expressly limited to organizations incorporated in Texas, the express purpose of the Act is to encourage charitable organizations to perform charitable services "within Texas." TEX. CIV. PRAC. & REM.CODE ANN. § 84.002(1). Thus, the purposes sought to be achieved by the Act would not be furthered by applying the Act to protect EAA, a Wisconsin-based charitable organization, from liability arising out of a charitable event that it conducted in Wisconsin.

We also note that EAA could have no justified expectation that it would be entitled to the protections afforded under the Act for liability arising out of its Wisconsin air show. The record indicates that volunteers from all over the country participated in the EAA convention and air show, and any expectation by EAA that it might be immune from liability for injuries sustained to participants, depending upon the residence of the participants who were injured, would be unreasonable. Had a Wisconsin resident, or a resident of another State without charitable immunity protections similar to those available in Texas, been injured, EAA would not have any claim to charitable immunity.

Finally, in regard to whether the application of Wisconsin law furthers the interests of certainty, predictability, and uniformity of result, we note that these interests are important when a party is likely to give advance thought to the legal consequences of its actions. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 cmt. i. Wisconsin does not provide charitable immunity, yet EAA elects to maintain its only offices in Wisconsin and to conduct its annual convention and air show in Wisconsin. Here, if we were to conclude that the domicile of the injured party or the forum of the suit were the controlling factors in determining what law to apply on the issue of charitable immunity, this conclusion would lead to unpredictable and non-uniform results. If we were to accept EAA's argument, by the same logic, a non-resident of Texas, injured in Texas by acts or omissions of a charity, incorporated in Texas and performing services in Texas, would undoubtedly pursue his claims against the charity in a non-Texas forum and argue against application of the Act. Such a result would be contrary to the clear purposes of the Act, which is to limit charities' liability arising out of services performed in Texas, regardless of the forum of the suit or the residence of the injured party.

In considering the "ease in the determination and application of the law to be applied," we recognize that Texas is the forum state and that the parties acquiesced to the trial court's application of Texas law to the liability issues. See Torrington Co., 46 S.W.3d at 850. We also note that the Doctors and Pardue are residents of Texas. However, after considering the choice of law principles in section 6 and the factors in section 145, we hold that Wisconsin is the State with the most sig-

8. We also note that Texas courts will only refuse to enforce a foreign law which violates good morals, natural justice, or is prejudicial to the general interests of our citizens. Robertson v. Estate of McKnight, 609 S.W.2d 534, 537 (Tex.1980). While Texas has elected to provide charities and volunteers with certain protections under the Act, a policy which does not provide such protections does not violate good morals or natural justice. Moreover, we note that applying Wisconsin law, on these facts, will not in any way prejudice the general interests of Texas citizens.

nificant relationship to the issue of charitable immunity and that Texas does not have an overriding interest in seeing the Act applied to this case.

In support of its argument for application of Texas law, EAA asserts that (1) EAA has been held to be subject to the general jurisdiction of Texas courts, (2) Wisconsin interests would be served by applying Texas law, and (3) the Act applies to foreign charities doing business in Texas. First, our sister court's finding that "Texas has a greater, or at least equal, interest with that of all other states in adjudicating this claim," was made in the context of a general jurisdiction analysis, which is completely distinct from the choice of law analysis undertaken by this Court. *See Experimental Aircraft Ass'n, Inc.*, 76 S.W.3d at 509. The fact that EAA has been held subject to general jurisdiction in Texas does not support EAA's argument that it should be entitled to the benefits and protections of the Act for liability arising out of conduct unrelated to its Texas contacts.

Second, EAA's argument that application of Texas law would serve the "interest of Wisconsin by reducing the damages awarded against its resident charitable organization" is without merit. Wisconsin has made a policy decision to eliminate charitable immunity, and has specifically elected not to offer protections to its charitable organizations similar to those available in Texas.[9] Texas courts have no authority to change Wisconsin public policy.

Third, the Act does not purport to encompass all charities incorporated in other states that do some business in Texas. Instead, the Act plainly states that it is intended to encourage the performance of charitable services within Texas. It does not indicate that simply because a charity has been found to maintain continuous and systematic contacts with Texas, it should be entitled to protections under Texas law for conduct and injuries occurring outside of Texas. Although a charitable organization that is incorporated in another state but performs services in Texas for the benefit of Texas residents may have a legitimate claim to the protections afforded under the Act, EAA is seeking protection from liability for conduct which occurred outside of Texas and which was not specifically directed at Texas residents.[10]

---

9. *See Butkera v. Hudson River Sloop "Clearwater", Inc.*, 300 N.J.Super. 550, 693 A.2d 520, 522–23 (1997) (noting that policy of state without charitable immunity "is to ensure the accountability in tort of its domiciliaries for the consequences of their negligent conduct").

10. Because of the lack of Texas authority on choice of law in the context of charitable immunity, the parties cite cases from other jurisdictions. *See Gilbert v. Seton Hall Univ.*, 332 F.3d 105 (2d Cir.2003); *Mason v. S. New England Conference Ass'n*, 696 F.2d 135 (1st Cir.1982); *Butkera*, 300 N.J.Super. 550, 693 A.2d 520; *Thomas v. Hanmer*, 109 A.D.2d 80, 489 N.Y.S.2d 802 (1985); *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). We note that the results reached by these courts, like the results reached by any court conducting a choice of law analysis, are highly dependent upon the facts of the case and the policies of the relevant forums. However, we must note that EAA's reliance on *Seiderman v. Am. Inst. for Mental Studies*, 667 F.Supp. 154 (D.N.J.), as persuasive authority, is misplaced. In *Seiderman*, a New Jersey resident was injured at a hospital located in New Jersey but incorporated in Pennsylvania. The hospital argued that the New Jersey charitable immunity law should apply. The court agreed, noting that the hospital conducted its activities in New Jersey, and that it could see no reason "why the accident of having been incorporated in Pennsylvania should affect [the hospital's] immunity status *with respect to charitable functions that it performed in New Jersey." Id.* at 158 (emphasis added).

Accordingly, we hold that the trial court erred in concluding that Texas was the state with the most significant relationship to the issue of charitable immunity as to EAA and in applying the Act to limit the liability of EAA.

We sustain appellants' fifth issue.

### Volunteer Immunity

■ In their sixth issue, the Doctors argue that the trial court erred in applying the Act to completely immunize Pardue because their injuries were caused by Pardue's negligent operation or use of an airplane. The Doctors further argue that because the question of whether there has been a statutory waiver of immunity is a question for the court, the trial court erred in submitting a question to the jury concerning the application of the Act to Pardue.

Pardue argues that the Act immunizes him because his alleged negligence did not involve the operation or use of an airplane and there was no nexus between his alleged negligent operation or use of an airplane and the Doctors' injuries. He contends that the Doctors' theory of liability was confined to their allegations that Pardue's negligence during his pre-flight briefing caused the collision and asserts that the Doctors "unwaveringly focused *not on* Pardue's operation or use of an airplane but upon Pardue's inadequate briefing and poor communication." He also asserts that the Doctors' evidence in support of their theory supports a deemed finding by the jury that the Doctors' injuries were not proximately caused by Pardue's negligent operation or use of an airplane.

The Act provides in relevant part:

(b) *Except as provided by Subsection (c) of this section* ... a volunteer who is serving as a direct service volunteer of a charitable organization is im-

mune from civil liability for any act or omission resulting in death, damage or injury if the volunteer was acting in good faith and in the course and scope of his duties or functions within the organization.

(c) A volunteer of a charitable organization *is liable* to a person for death, damage, or injury to the person or his property *proximately caused by any act or omission arising from the operation or use of any motor-driven equipment, including an airplane,* to the extent insurance coverage is required ... and to the extent of any existing insurance coverage applicable to the act or omission.

Act of June 1, 1987, 70th Leg., ch. 370, § 1, 1987 Tex. Gen. Laws 1808 (amended 2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 84.004 (Vernon 2005) (emphasis added)).

The charge contained a question that asked the jury whether Pardue "was acting in good faith and in the course and scope of his duties and functions" as a volunteer in a charitable organization at the time of the occurrence in question. The charge did not contain any question as to whether the Doctors' injuries were proximately caused by an act or omission arising from the operation or use of an airplane, and neither party requested a submission on this issue. Instead, the charge simply asked the jury whether the negligence of Pardue caused the occurrence in question.

During the charge conference, the Doctors objected to the submission of the question regarding Pardue's volunteer status as "not relevant since [all parties] agreed that Mr. Pardue is limited to the $175 million in coverage." It appears from the record that, by making this objection, the Doctors conceded that, if the Act prop-

erly applied, Pardue was a volunteer and he was entitled to the protections afforded under subsection (c) of section 84.004, and thus could be held liable only to the extent of any existing insurance coverage applicable to Pardue's alleged acts or omissions. The court overruled the Doctors' objection, and submitted a question about Pardue's volunteer status.

The jury found that Pardue was acting in good faith and in the course and scope of his duties and functions as a volunteer in a charitable organization at the time of the collision, and the trial court, based on this finding, rendered final judgment that the Doctors take nothing from Pardue. There is nothing in the record to indicate why the trial court applied section 84.004(b), immunizing Pardue from liability, instead of applying subsection (c), and limiting Pardue's liability "to the extent of any existing insurance coverage applicable."

The Doctors did not specifically raise this issue in their motion for new trial or in their motion to modify, correct, or reform the judgment. Instead, the Doctors contended that the evidence was factually insufficient to support the jury's finding that Pardue was acting as a volunteer in a charitable organization at the time of the collision and, alternatively, that the jury finding on this issue was immaterial since Wisconsin law, which should have been applied pursuant to the most significant relationship test, did not provide immunity for Pardue.[11] However, in their motion to disregard jury findings and for judgment notwithstanding the verdict, filed after the trial court entered a take-nothing judgment in favor of Pardue, the Doctors argued that the jury's finding that Pardue was acting as a volunteer should be disregarded because the evidence established,

as a matter of law, that the Doctors' injuries were caused by Pardue's acts or omissions arising from the operation or use of an airplane.

Here, the record reveals that the Doctors alleged, and presented evidence at trial, that Pardue, in his role as a flight leader and participant in the air show, negligently caused the collision. While EAA and Pardue vigorously disputed liability at trial, the jury apportioned 25% liability to EAA and 25% liability to Pardue, and neither defendant challenges the legal or factual sufficiency of the evidence supporting those negligence findings. The Doctors did assert and did offer testimony concerning the adequacy of the pre-flight briefing provided by Pardue and Pardue's execution of the flight plan and his communication to the other pilots, before and during the run up and during the flight in question. However, Pardue's argument that there was no nexus between his alleged negligent operation or use of an airplane and the Doctors' injuries necessarily fails. The jury found that the negligence of Pardue caused the occurrence in question. Any such negligence in regard to Pardue's MEM pre-flight briefing, execution of the flight plan, and/or communication with other pilots directly concerned his operation and use of his aircraft. More importantly, both Lad and Pardue were piloting their planes at the time of the collision. The bottom line is that the evidence conclusively shows that Lad was injured when, in the course of performing in the air show, his aircraft collided on the runway with an aircraft piloted by Pardue. Thus, the evidence establishes, as a matter of law, that the Doctors' injuries were proximately caused by an act or omission "arising from the operation or use of . . .

---

11. The Doctors have abandoned their argument that Wisconsin law should have applied on the issue of charitable immunity as to Pardue.

an airplane." [12] TEX. CIV. PRAC. & REM.CODE ANN. § 84.004(c). Accordingly, we hold that the trial court erred in not applying section 84.004(c) of the Act, limiting the liability of Pardue to the extent that he possessed any applicable insurance coverage.

Alternatively, Pardue argues that the Doctors waived any error based on their contention that their injuries were proximately caused by Pardue's negligent operation or use of an airplane because they failed to request a jury question on this issue, object to this omission from the charge, obtain written findings necessary to support a judgment of liability, and object to the trial court's take-nothing judgment on the grounds of legally or factually insufficient evidence. The Doctors, however, argued in a post-judgment motion that the evidence established, as a matter of law, that their injuries were caused by Pardue's acts or omissions arising from the operation or use of an airplane. Pardue emphasizes that this argument was made in the Doctors' "motion to disregard jury findings and for judgment nov" rather than in their motion for new trial or in their motion to modify, correct, or reform judgment.

■ The effect of a motion depends on the nature of the instrument, and we look to an instrument's substance rather than its form. *Finley v. J.C. Pace Ltd.*, 4 S.W.3d 319, 320 (Tex.App.-Houston [1st Dist.] 1999, no pet.). The substance of a motion is not determined solely from its caption or introduction, but instead is gleaned from the body of the motion and the prayer for relief. *Id.* Furthermore,

the supreme court has stated that "a timely filed post-judgment motion that seeks a substantive change in an existing judgment qualifies as a motion to modify under Rule 329b(g)." *Lane Bank Equip. Co. v. Smith S. Equip. Co.*, 10 S.W.3d 308, 314 (Tex.2000); *see also* TEX.R. CIV. P. 329b(g); *Ramirez v. Williams Bros. Constr. Co.*, 870 S.W.2d 551, 552 (Tex.App.-Houston [1st Dist.] 1993, no writ); *Brazos Elec. Power Coop., Inc. v. Callejo*, 734 S.W.2d 126, 129 (Tex.App.-Dallas 1987, no writ).

■ Here, after the entry of the final judgment, which provided absolute immunity to Pardue, the Doctors contemporaneously filed multiple post-judgment motions, including a motion for new trial, a motion to modify, correct, or reform the judgment, and a motion to disregard jury findings and for judgment notwithstanding the verdict. In their argument that the evidence established, as a matter of law, that the Doctors' injuries were caused by Pardue's acts or omissions arising from the operation or use of an airplane, it is readily apparent that the Doctors were seeking a substantive change in the judgment. We thus conclude that appellants preserved this issue for our review.

Having held that the trial court erred in not applying section 84.004(c) of the Act and limiting the liability of Pardue to the extent that he possessed any applicable insurance coverage, we further hold that the trial court erred in rendering a take-nothing judgment in favor of Pardue.

We sustain appellants' sixth issue.

### Damages

In their first issue, the Doctors argue that, because it is undisputed that Lad

---

12. We note that the Doctors do not challenge the sufficiency of the evidence to support the jury's finding that Pardue qualified as a volunteer under the Act. The Doctors argue only that the evidence established that their injuries were proximately caused by any act or omission arising from the operation or use of an airplane. They agree that Pardue is entitled to the limited protection available under section 84.004(c), but assert that Pardue is not entitled to absolute immunity under section 84.004(b).

suffered catastrophic injuries that rendered him a quadriplegic, the jury's zero damage findings for intangible damages, including past and future physical impairment, past and future mental anguish, and past and future disfigurement, are against the great weight and preponderance of the evidence. In their second issue, the Doctors argue that the jury's zero damage finding for past medical expenses is against the great weight and preponderance of the evidence because there was uncontroverted evidence of approximately $400,000 in past medical expenses. In their third issue, the Doctors argue that the jury's award of $2.5 million in damages for future medical expenses is against the great weight and preponderance of the evidence because EAA's and the Doctors' expert testimony established a range of $5.3 million to $8.1 million for future medical expenses. In their fourth issue, the Doctors argue that because there is uncontroverted evidence of Linda's loss of consortium as a result of Lad's injuries, the jury's finding of zero damages for Linda's past loss of consortium and $50,000 in damages for Linda's future loss of consortium are against the great weight and preponderance of the evidence.

EAA and Pardue do not respond to the Doctors' first four issues.[13]

### Standard of Review

To sustain a challenge to the factual sufficiency of a jury's failure to award damages or its award of inadequate damages, we consider and weigh all the evidence, both supporting and against the findings, in order to decide whether the verdict should be set aside. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986); *Prescott v. Kroger Co.*, 877 S.W.2d 373, 374 (Tex.App.-Houston [1st Dist.] 1994, writ denied). We will uphold the jury's verdict unless it is so against the great weight and preponderance of the evidence as to be manifestly unjust or shocking to the conscience. *Pool*, 715 S.W.2d at 635; *Prescott*, 877 S.W.2d at 374. We may not merely substitute our judgment for that of the jury. *Pool*, 715 S.W.2d at 635. We note that the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003). When, as in this case, the jury's failure to find greater damages in more than one overlapping category is challenged, we must first determine if the evidence unique to each category is factually sufficient. *Id.* at 775.[14] If it is not, we must then consider all the overlapping evidence, together with the evidence unique to each category, to determine if the total amount awarded in the overlapping categories is factually sufficient. *Id.*[15]

---

**13.** In their briefing and at argument, EAA contended that because the Texas Charitable Immunity and Liability Act was properly applied by the trial court, the Doctors recovered the maximum amount of damages available, and thus it was not necessary for this Court to reach the Doctors' issues concerning the jury's damages findings.

**14.** The supreme court has noted that certain categories of non-economic damages may somewhat overlap. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 770–71, 773–74 (Tex.2003). "Non-economic damages include compensation for pain, suffering, men-

tal anguish, and disfigurement," and may also include compensation for loss of enjoyment of life. *Id.* at 763.

**15.** "This standard of review gives due regard to a jury's choice of whether and how to categorize and compensate for specific losses or injuries that could reasonably fall into more than one category of damages." *Golden Eagle Archery, Inc.*, 116 S.W.3d at 775. "It also advances the principles that a tort victim should be fully and fairly compensated, but that a double recovery should be avoided." *Id.*

### The Court's Charge

■■■ The charge asked the jury what sum of money would fairly and reasonably compensate Lad for his injuries resulting from the collision. It required the jury to answer separately for the following elements of damages: (1) physical pain and mental anguish sustained in the past; (2) physical pain and mental anguish that, in reasonable probability, will be sustained in the future; (3) disfigurement sustained in the past; (4) disfigurement that, in reasonable probability, will be sustained in the future; (5) physical impairment sustained in the past; (6) physical impairment that, in reasonable probability, will be sustained in the future; (7) reasonable expenses of necessary medical care in the past; and (8) reasonable expenses of necessary medical care that, in reasonable probability, will be sustained in the future. The charge also asked the jury what sum of money would fairly and reasonably compensate Linda for her past and future loss of consortium. It instructed the jury to "consider the elements of damages listed and none other," to "consider each element separately," and to "not include damages for one element in any other element." [16]

In regard to Lad, the jury awarded $2.5 million in damages for future medical expenses and zero damages for past and future physical pain and mental anguish, past and future disfigurement, past and future physical impairment, and past medical expenses. In regard to Linda, the jury awarded zero damages for past loss of consortium and $50,000 for future loss of consortium.

### The Evidence

In our determination of whether the verdict should be set aside, we now consider and weigh all the evidence, both supporting and against these findings.

*Past and future physical impairment, physical pain and mental anguish, and disfigurement*

■■■■ In order to recover damages for physical impairment, "the effect of any physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity." *Golden Eagle Archery, Inc.*, 116 S.W.3d at 772. Moreover, the "loss of enjoyment of life" may be considered as a factor in assessing damages for physical impairment. *Id.* In order to recover mental anguish damages, a plaintiff must establish "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). Disfigurement has been defined as that which impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner. *Goldman v. Torres,* 161 Tex. 437, 341 S.W.2d 154, 160 (1960); *Sunbridge Healthcare Corp. v. Penny,* 160 S.W.3d 230, 252 (Tex.App.-Texarkana 2005, no pet.).

■■■ Here, the undisputed evidence establishes that Lad suffered a spinal cord injury in the collision and was rendered a quadriplegic. Lad has a "high level quadriplegia" and is no longer able to walk or move his legs, arms, or hands. He suffers from substantial swelling as a result of his inability to move his limbs. He has feeling only in his face and is able to power his wheelchair only by using his head and mouth. Lad has significant respiratory problems, his breathing muscles are impaired, and he requires daily breathing treatments and nighttime ventilation. At

---

16. Unless the record demonstrates otherwise, we must presume that the jury followed these instructions. *Golden Eagle Archery, Inc.,* 116 S.W.3d at 771.

the time of trial, he required ventilator treatments three to four times daily and Lad's physician testified that, if his condition persisted, he would always require ventilation. As a result of the collision, Lad's diaphragm is abnormal. He fatigues when he talks for extended periods of time, and as he talks, carbon dioxide builds up in his lungs, which causes him to suffer from confusion and disorientation.

Lad is not able to care for himself. He has no bladder or bowel control and must undergo bowel treatments daily. He can be transferred from his bed to his wheelchair only with the assistance of at least two other people. He must use special seats, mattresses, and other equipment. He must be repositioned every thirty minutes to prevent skin problems, and must have his skin brushed every day. As Lad ages, his risk of skin breakdown will increase and his immune system will continue to decline. He also has spasms and tremors when he is touched.

Lad has suffered numerous medical complications related to his spinal cord injury that have made his condition very fragile. His condition has caused profound osteoporosis, and he cannot control his body temperature, which may quickly reach as high as 105 degrees or as low as 94 degrees. He suffers from life-threatening blood-pressure problems. Lad does not sleep well; he wakes up every two to three hours, and sometimes only sleeps two to three hours a night.

Moreover, Lad's condition has worsened since the collision, and the level at which he has no feeling has risen. At the time of trial, surgery was planned in hopes of improving his condition. However, it is undisputed that Lad will always be a quadriplegic and will always be incapable of caring for himself.

· Lad testified, in explicit detail, concerning the physical pain and mental suffering that he has experienced. He described the indignity he feels as a result of his condition and his constant need for assistance in performing the most basic of human functions. Lad related his feelings of depression when he discovered that, despite every effort at rehabilitation, he would never walk again and would always need a ventilator to breathe. Lad also noted that during one particular treatment, when a tube was inserted into his throat, he gagged, his jaw cracked, and he experienced severe discomfort. Lad explained that suctioning performed on him during treatment is very uncomfortable and that breathing through a ventilator is also very uncomfortable. When his blood pressure is elevated, Lad experiences headaches and painful tightening of his neck.

Linda testified that Lad has never been able to cope with his paralysis and that he is extremely depressed. Lad has described himself to Linda "as a head on top of a body." Lad's general attitude has significantly changed for the worse, he frequently becomes angry, and he has stated that he would like to die. Lad has undergone counseling to attempt to cope with his injuries, but Lad and his family are frightened by his condition, and Lad lives in fear. Specifically, Lad is fearful that his ventilator may stop working or that he will be dropped when being transferred or moved. Lad is also fearful that he may be injured by someone attempting to assist him.

The Doctors also presented extensive evidence concerning Lad's hospitalization, and the pain and suffering that he has experienced during those hospitalizations. Immediately after the collision, Lad was taken to a local medical center and then transferred to a spinal cord injury unit at another hospital, where he stayed for one week. While there, he was placed on a

ventilator and fed through a stomach tube. Linda testified that Lad was terrified. Lad was then transferred to another hospital for continued spinal cord care, and remained at that hospital for another month. There, Lad underwent decompression surgery to stabilize his neck, during which pins were inserted into his neck to hold it in place. These metal pins cause Lad pain. While at this medical center, Lad could not communicate with anyone, make any sound, or press a call button to summon the assistance of the nurses. Lad could not move his head, but he did experience discomfort in his head, and was medicated for that discomfort. Lad also was strapped to a board to completely immobilize him.

Lad was then transferred to another care facility for rehabilitation, where he remained for another two months. There, Lad suffered from numerous medical conditions and complications, including pneumonia, respiratory problems, infections, hypertension, and anemia.

### Past medical expenses

■ To recover past medical expenses, a claimant must prove that the expenses were reasonable and necessary. *Nat'l Union Fire Ins. Co. v. Wyar*, 821 S.W.2d 291, 297 (Tex.App.-Houston [1st Dist.] 1991, no writ). A plaintiff may prove medical expenses are reasonable and necessary by submitting affidavits in compliance with section 18.001 of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE ANN. § 18.001 (Vernon Supp.2004–2005); *see also Jackson v. Gutierrez*, 77 S.W.3d 898, 902 (Tex.App.-Houston [14th Dist.] 2002, no pet.). In this case, the Doctors presented medical billing records supported by affidavits, which established reasonable and necessary medical expenses of over $400,000. EAA even essentially conceded during closing argument that the Doctors had proven past medical expenses in this amount.

### Future medical expenses

■ Texas follows the "reasonable probability rule" for future damages for personal injuries. *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). Thus, to recover future medical expenses, a plaintiff must show that there is a reasonable probability that expenses resulting from the injury will be necessary in the future and the reasonable costs of such care. *Id.*

Here, the Doctors' expert testified in support of an award of $8,134,659.08 in future medical expenses. EAA's expert testified to $5,320,027 in future medical expenses. In closing argument, EAA argued that an award of five million dollars for future medical expenses would be "more than reasonable." Yet the jury awarded only $2.5 million for future medical expenses, less than half the amount recommended by EAA's own expert.

### Loss of consortium

Linda testified that before the accident, Lad was a warm and caring husband, but since the accident he does not like for Linda to kiss him and that she can no longer talk to him because he has so much with which to cope. Linda explained that she no longer has her husband to console her and that she wakes up each morning with the same realization that Lad is paralyzed.

### The jury's findings

In regard to their first issue, the Doctors presented overwhelming and uncontroverted evidence establishing that, as a result of the collision, Lad was rendered a quadriplegic and that Lad sustained, and in reasonable probability would sustain in the future, severe physical pain and mental

anguish. The evidence also establishes that Lad is disfigured and physically impaired as a result of the collision. It was uncontroverted that Lad would remain disfigured and physically impaired for the remainder of his life. Furthermore, the record reveals that appellees made virtually no attempt to controvert the Doctors' evidence concerning these elements of damages. Yet the jury awarded zero damages in each of these categories. EAA and Pardue present us with no record citations to evidence that in any way supports the jury's zero damage findings for Lad's non-economic damages, and we have found no such evidence.

Accordingly, we hold that the jury's zero damage findings on Lad's past and future physical pain and mental anguish, past and future physical impairment, and past and future disfigurement are so against the great weight and preponderance of the evidence as to be manifestly unjust and shocking to the conscience. Moreover, in regard to *Golden Eagle Archery, Inc.,* we note that because the jury awarded zero damages for every category of potentially overlapping non-economic damages claimed by Lad, there is no possibility that the jury elected to compensate Lad for his physical pain or mental anguish in any other category of non-economic damages. *See* 116 S.W.3d at 773–75.

We sustain the Doctors' first issue. Having held that the evidence is factually insufficient to support the jury's zero damage findings for Lad's past and future physical pain and mental anguish, past and future physical impairment, and past and future disfigurement, we need not address the Doctors' second, third, and fourth issues concerning the jury's damage findings for Lad's past and future medical expenses and Linda's loss of consortium. *See Hicks v. Ricardo,* 834 S.W.2d 587, 590 (Tex.App.-Houston [1st Dist.] 1992, no writ) (indicat-

ing that case should be reversed and remanded for new trial if court finds that one of jury's damage findings is against great weight and preponderance of evidence).

## Conclusion

We reverse and remand this case for a new trial.